666 F.2d 791
 Walter SHER, Petitioner-Appellee,
v.
Donald STOUGHTON, Commissioner of Corrections, Onondaga
County Correctional Facility, Jamesville, New
York; Benjamin Ward, New York State
Commissioner of Corrections,
Respondents-Appellants.
 No. 336, Docket No. 81-2221.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 26, 1981.
Decided Dec. 14, 1981.
 
 Faith A. Seidenberg, Seidenberg & Strunk, Syracuse, N. Y., for petitioner-appellee.
 Bruce E. Whitney, Asst. Dist. Atty., County of Nassau, Mineola, N. Y. (Denis Dillon, Dist. Atty., County of Nassau, William C. Donnino, Asst. Dist. Atty., Mineola, N. Y., of counsel), for respondents-appellants.
 Before FEINBERG, Chief Judge, and MANSFIELD and NEWMAN, Circuit Judges.
 FEINBERG, Chief Judge:
 
 
 1
 Respondents Donald Stoughton, Commissioner of Corrections, Onondaga County Correctional Facility, and Benjamin Ward, New York State Commissioner of Corrections (collectively referred to as "the State") appeal from an order of the United States District Court for the Northern District of New York, Howard G. Munson, Chief Judge, granting Walter Sher's petition for a writ of habeas corpus and ordering Sher's release from custody unless the State retries Sher within 60 days. The basis for the court's ruling was that anonymous telephone communications with several jurors during the course of Sher's trial violated his constitutional right to a fair trial. For the reasons stated below, we reverse the judgment of the district court.
 
 
 2
 * Sher was convicted in New York State Supreme Court in 1963 of, among other crimes, two counts of first degree murder. He was sentenced to death on each count, but his sentence was commuted to life imprisonment by then Governor Rockefeller and later by statute, N.Y.Exec.Law § 259-h, to an indeterminate term of imprisonment of not less than 20 years nor more than life. Sher appealed his conviction directly to the New York Court of Appeals, a procedure authorized in capital cases by Article 6, § 3(a) of the New York Constitution and former New York Code of Criminal Procedure § 517(1), which also empowered that court to review questions of fact as well as of law in such cases. One of Sher's arguments in that court was that he had been deprived of a fair trial because of "gravely prejudicial" communications to jurors from an unknown third party during his trial. The Court of Appeals affirmed his conviction by a four to three vote. People v. Sher, 24 N.Y.2d 454, 301 N.Y.S.2d 46, 248 N.E.2d 887 (1969). Sher's petition for a writ of certiorari was denied. Sher v. New York, 396 U.S. 837, 90 S.Ct. 96, 24 L.Ed.2d 87 (1969).
 
 
 3
 In 1970, proceeding pro se, Sher sought a writ of habeas corpus in the United States District Court for the Eastern District of New York, citing the anonymous telephone calls among his reasons for the writ. That petition was dismissed on the merits by Judge Travia. U. S. ex rel. Sher v. LaVallee, 70-C-124 (June 25, 1970). Applications to the district court and to this court for a certificate of probable cause were denied as was Sher's second petition for a writ of certiorari. Sher v. LaVallee, 404 U.S. 834, 92 S.Ct. 118, 30 L.Ed.2d 65 (1970).
 
 
 4
 In 1977, this time represented by counsel, Sher petitioned the United States District Court for the Northern District of New York for a writ of habeas corpus, raising the identical issue presented to the New York Court of Appeals and in his earlier petition to the Eastern District. The petition was referred to Magistrate John P. McLane, who in 1978 recommended that it be denied. In October 1980, the district court refused to accept the magistrate's recommendation and granted Sher's petition. After the State appealed, we remanded the case in March 1981 for reconsideration in light of Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1980), decided after the district court had granted the petition, and for a written explanation as required by Mata of the district court's disagreement with the state court's presumptively correct findings of fact. 657 F.2d 264. Following remand, the district court discussed the effect of Mata on this case but once more granted Sher's petition. 516 F.Supp. 534. The State again appeals.
 
 II
 
 5
 Sher's conviction for murder arose out of an attempted robbery of a jewelry store in 1962 during which one of the owners of the store was killed by a shot fired by Sher. Before trial began, a New York County Court found Sher not sufficiently capable of understanding the charges pending against him to make a defense and to confer intelligently with counsel. Sher was committed to Matteawan State Hospital. In the meantime, Sher's co-defendant, Dominic Carbonaro, was tried and found guilty of murder. Sher was released in 1963, and thereafter was tried before a jury. His principal defense was insanity.
 
 
 6
 At trial, the State introduced "overwhelming" evidence of Sher's guilt. People v. Sher, 24 N.Y.2d at 457, 301 N.Y.S.2d 46, 248 N.E.2d 887. Sher was identified both in lineups and in court by several eyewitnesses who had been present at the scene of the crime and at the getaway. A palmprint was taken from the steering wheel of the getaway car and identified as Sher's. Sher made two detailed confessions of the crime, one written and signed by Sher and the other oral. Sher admitted in his brief before the New York Court of Appeals that "(t)here is no question but that Walter Sher and Dominic Carbonaro were both involved in the perpetration of acts which, assuming a proper and fair trial and a finding of sanity, would justify a conviction." People v. Sher, id.
 
 
 7
 The crux of this appeal grows out of an incident that occurred after the State had rested its case and before Sher presented his defense, when trial was in recess for two days. The night before trial was to resume, an unidentified female called six jurors on the telephone at their residences and was successful in speaking with five of them. When the jurors returned to court the next morning, the trial judge was informed of the telephone calls and that the jurors had discussed the calls among themselves. Immediately thereafter and before the trial resumed, the trial judge called each juror and each alternate juror into chambers individually and, in the presence of the defendant, his counsel and the prosecutor, conducted an inquiry into the nature of the communication. Each juror was asked whether he had received a call and what he was told. Jurors who had not received calls were asked if they had discussed the calls with the other jurors. Several of the jurors said that they had discussed the calls among themselves, and other jurors admitted overhearing those discussions. The jurors who received the calls said they were told that Sher was guilty, that his defense counsel should be disregarded, that the juror should urge the other jurors to vote for the "electric chair" and that the defendant's insanity defense should be disregarded. One juror, William Nachbar, was also told that the defendant had a prior record, that he was a "vicious killer" and that his co-defendant had been sentenced to death.
 
 
 8
 Following his thorough inquiry into the nature of the communication, in which counsel was given the opportunity to ask questions but did not do so, the trial judge carefully instructed each juror "that any effort to tamper with a juror is not only illegal but it is improper and is no part of the evidence in the case." The trial judge then meticulously inquired of each juror whether he could "put (the call) out of (his) mind as though it had never occurred?" Each juror answered that he could. The trial judge went on to ask "Do I have your assurance that it will be no part of your consideration, that no inferences will be drawn therefrom?" Each juror assured the court that he could remain impartial and that he would decide the case only on the evidence presented at trial. Juror Nachbar also assured the court that the call had "strengthened (his) resolve to be completely impartial and to be governed by the evidence alone."
 
 
 9
 Following the inquiry, the prosecutor stated that he would have no objection if juror Nachbar were replaced. Defense counsel then moved for the withdrawal of a juror and for a mistrial, stating that he did not know "of any procedure whereby one juror under these circumstances can be challenged and an alternate take his place." Defense counsel declined the opportunity to consider the question further, and his motion for a mistrial was denied. Trial resumed, the defendant presented his defense, and the jury returned a verdict of guilty.
 
 III
 
 10
 Turning to the merits of the appeal, the issue is whether the anonymous telephone calls to the jurors so violated Sher's constitutional rights as to require a new trial in the state court. The rights involved may be viewed as a defendant's right to confront the evidence against him or to a fair trial by an impartial jury, or as a combination of both. Regardless of how the issue is phrased, however, there is no doubt that an unauthorized, ex parte communication with jurors is regarded as "presumptively prejudicial," Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 710 (1954). But it is still open to the State to rebut the presumption and to show that the communication was harmless. As we pointed out in United States ex rel. Owen v. McMann, 435 F.2d 813, 818 (2d Cir. 1970),
 
 
 11
 The touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter, with the supposed consequences that the infiltrator becomes a "witness" and the confrontation clause automatically applies, but the nature of what had been infiltrated and the probability of prejudice.
 
 
 12
 Such an analysis requires a careful examination of the substance of the telephone calls and of the other information of which the jurors were properly aware.
 
 
 13
 It is immediately apparent that what the anonymous caller told four of the five jurors she spoke to was not, strictly speaking, information at all but was an exhortation to convict Sher, i.e., the jurors were told that Sher was guilty and were urged to vote for the "electric chair" and to disregard defense counsel and Sher's insanity defense. At the time the calls were received, the jurors had already heard the government's case in detail, which place the onus for the killing on Sher and included several eyewitnesses. Sher's confessions and the facts of the crime, which even defense counsel had characterized as "horrible" in voir dire. Further, the jurors were aware that the defendant intended to try to prove his insanity at the time of the crime, and defense counsel had questioned the jurors during voir dire about their receptiveness to psychiatric testimony. Moreover, as soon as the matter was called to his attention, the trial judge promptly engaged in a thorough voir dire procedure with each juror, see Remmer v. United States, 347 U.S. at 230, 74 S.Ct. at 451; United States v. Herring, 568 F.2d 1099, 1106 (5th Cir. 1978); cf. Sullivan v. Fogg, 613 F.2d 465, 467-68 (2d Cir. 1980). It is true that the district judge felt that these "curative measures" were "intrinsically ineffectual." Because the jurors had discussed the telephone calls with each other, after being instructed "not to discuss the case among themselves," the district judge could not "place faith in the jurors' subsequent, unsworn declarations that they could remain true to an oath of impartiality and fairness." We think that this conclusion was far too sweeping, and unjustifiably disregarded the appraisal of the state trial judge as to whether the jurors would follow his instructions. We believe that under the circumstances, the trial judge's individual voir dire and careful instructions were adequate to deal with this situation.
 
 
 14
 The telephone call to juror Nachbar, however, requires further discussion, since Nachbar was told that Sher was a "vicious killer" and had a prior record and that his co-defendant had been sentenced to death. The evidence as to the killing was already in the record, of course, and, as indicated above, was not disputed. Also, as part of his insanity defense, Sher subsequently introduced into evidence his prior medical records in extensive detail. These records included information that Sher had received a bad conduct discharge from the United States Army following a 10-month term at hard labor at Leavenworth Disciplinary Barracks, had used drugs, had committed forgery, had been incarcerated for larceny and had committed other crimes, including robbery. In granting the writ, the district judge concluded that "(b)ecause the caller did not elaborate the past record of Sher, Mr. Nachbar could reasonably have believed that Sher did not make known in open court all of his past criminal actions." Considering the substantial evidence of Sher's prior bad acts that was admitted into evidence, such a conclusion was unwarranted. Moreover, evidence of any further criminal record would have been cumulative, and it is difficult to see how the possibility that it existed could on this record have been prejudicial.
 
 
 15
 In addition, juror Nachbar was told by the caller that Sher's co-defendant had been sentenced to death. The issue presented to the jury at Sher's trial was whether he was legally chargeable with a killing that he admitted. Moreover, the co-defendant's guilt was virtually admitted at Sher's trial. Also, Sher's counsel apparently did not consider information about the co-defendant's sentence significantly damaging since he did not challenge another juror who admitted during voir dire that he had "within recent days" read about the "disposition" of the co-defendant's case. This apparently included information regarding the sentence, as the co-defendant had been sentenced to death six days earlier. The jurors were also aware that one possible sentence for the admitted killing was death. But most importantly, Sher's very individual defense of insanity and the different legal issues thereby raised could not have been affected by information as to his co-defendant's sentence.[1]
 
 
 16
 To persuade us that the calls were prejudicial, Sher calls to our attention a number of cases, but they involve different situations from the one presented here. Sher admits that whether the impact of such contact denied an accused his fundamental right to a fair trial turns on the "special facts" of each case. Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1172, 3 L.Ed.2d 1250 (1959). Unlike Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), the caller in this case was anonymous and had no official status that might have caused the jurors receiving the calls to consider the contact significant. Indeed, one of the jurors spoke for a moment to the caller and then told his wife to hang up, and the wife of another immediately terminated the call, indicating that the jurors "easily understood" that the caller was "to be given no credence, if so advised and admonished." People v. Sher, 24 N.Y.2d at 458, 301 N.Y.S.2d 461, 248 N.E.2d 887. Further, the state trial judge did so advise and admonish the jurors. The judge also conducted a prompt and careful inquiry into the nature of the information provided and the possibility of prejudice, a procedure that was not followed in Parker v. Gladden because the bailiff's remark there came to light only in a post-conviction proceeding.
 
 
 17
 Appellee also relies heavily on United States v. Ferguson, 486 F.2d 968 (6th Cir. 1973), where a juror who had been improperly contacted tried to persuade another juror of the defendant's innocence. Although the former juror was removed from the jury, the latter was not. In reversing the convictions, the Sixth Circuit was concerned that the trial judge's removal of one juror might have been "indicative" to at least the other "of a possible attempt by defendants to influence the jury improperly." 486 F.2d at 971-72. No possibility of that type of prejudice existed here. The other cases relied on by appellee are also distinguishable. Thus, in Donovan v. Davis, 558 F.2d 201 (4th Cir. 1977), seven jurors in defendant's trial for attempted rape had, a week earlier, heard evidence as jurors in defendant's trial for an unrelated offense that predisposed them "to disbelieve" the defendant in the second trial. Id. at 204. Wall v. Supt., Virginia State Penitentiary, 553 F.2d 359 (4th Cir. 1977), involved a similar situation. And in Bulger v. McClay, 575 F.2d 407 (2d Cir.), cert. denied, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978), the jurors had learned from a newspaper article "crucial information not in the trial record" and "tended to discredit" defendant's case. Id. at 411.
 
 
 18
 In sum, the actions of the anonymous caller were deplorable and "presumptively prejudicial," Remmer v. United States, 347 U.S. at 229, 74 S.Ct. at 451. Nevertheless, in view of what the caller actually told the jurors, the information that they properly had before them, the trial judge's careful and prompt voir dire and curative instructions, and the trial judge's implicit finding of fact that the jury had not been improperly influenced, which was confirmed by the New York Court of Appeals, we see no sufficient basis for setting aside the finding of that court that under the circumstances the calls "resulted in no palpable prejudice to the defendant." People v. Sher, 24 N.Y.2d at 457, 301 N.Y.S.2d 46, 248 N.E.2d 887. Cf. Sumner v. Mata, supra.
 
 
 19
 In view of our decision on the merits, we find no need to discuss other issues raised by appellant.[2]
 
 
 20
 The judgment of the district court is reversed.
 
 
 
 [1]
 Although aware of the information that only juror Nachbar received, defense counsel at the state trial apparently chose not to seek the removal and replacement of Nachbar alone but contented himself with a general motion for a mistrial
 
 
 [2]
 E.g., appellants claim that the district court abused its discretion in entertaining the habeas petition now before us, because a previous petition raising the same issue had been considered and dismissed on the merits over seven years earlier by another district judge. This is a close question, which the trial judge decided in appellee's favor because he was not represented by counsel when he filed his first petition and because of a supposedly applicable intervening change in the law