UNITED STATES of America,

v.

James HILLARD, Defendant.

No. SS82 Cr. 143 (MEL).

United States District Court,
S. D. New York.

Sept. 17, 1982.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for the U. S.; Mary Lee Warren, Asst. U. S. Atty., New York City, of counsel.

David Breitbart, New York City, for defendant.

LASKER, District Judge.

James Hillard moves pursuant to Fed.R. Cr.Pr. 33 for a new trial. The motion is based on three items of extra-record information which he claims may have come to the attention of a juror or jurors during the course of his trial. The items are:

(1) that Hillard's counsel, David Breitbart, had formerly been both a prosecutor and counsel for a major narcotics figure;

(2) that certain defendants had been released on bail during the trial, while others were in custody; and

(3) that "Black Sunday," the heroin network which Hillard allegedly controlled, was an actual operation that still existed at the time of trial.

The first two items came to light during the jury's deliberations on July 2, 1982. Juror No. 1, Ms. Blackwelder, advised the Court and counsel that certain "improprieties" had occurred in the jury room; in particular, that a relative of Debra Gause, Juror No. 3, had been present in the courtroom during the trial, and had shared certain extra-record information with Gause about Breitbart's experience and the custodial status of the various defendants. Gause was immediately summoned for an inquiry on these matters, in the presence of counsel and on the record. In response to questions from the Court, Gause explained that her cousin, Kibra Phillips, had accompanied her to New York City from Poughkeepsie, where they both resided, because she had been afraid to travel to and from New York by herself. She stated that her cousin had told her that some of the defendants had been handcuffed and others had not, and that she had also been told that Breitbart had formerly been a prosecutor. Gause was then sworn, and asked by the Court whether she had related the full content of her conversations with her cousin concerning the case, to which she responded in the affirmative. Certain defense counsel urged that additional members of the jury be questioned, and as a result, Juror No. 8, Marion Smith, who had impressed us "as being very steady and sensible" (Transcript at 2031), was questioned as to comments, if any made by Gause to her as to Breitbart's history or the custodial status of the defendants. Her answers were basically consistent with the answers of Blackwelder and Gause.

At that point, we determined that sufficient inquiry had been conducted. We found Gause to have been credible in her statements as to the extent of her discussions with her cousin. Although any discussion between a juror and any other person concerning a trial on which that juror is sitting is improper, a cautionary instruction seemed sufficient to dispel any confusion and alleviate any prejudice which Gause's revelations had created among the jurors.

The jury was convened, and instructed that neither the background of the attorneys nor the custodial status of the defendants were of any relevance to the issues before them and should be disregarded:

"I talk about those things to . . . tell you that neither of those propositions has anything to do, I underline the words— anything to do—with the issues that you have before you. . . . I therefore urge you and emphatically instruct you to return to your deliberations, put aside such irrelevancies and deal with the issues in the case."

(Transcript at 2042–44).

The third item of extra-record information came to light several days later. With the permission of the Court, attorney Breitbart interviewed Kibra Phillips, Juror Gause's cousin. Breitbart informed the Court that Phillips had stated that she and another relative of hers had had a conversation in the presence of Gause during the course of the trial about the Black Sunday operation and the quality of Black Sunday heroin. (Transcript at 2114–15).[1]

While this disclosure appeared more serious than the earlier ones, it came at a time when deliberations had already been going on for three and a half days, and we deter-

---

1. The affidavit later submitted by Phillips diverged slightly from Breitbart's account of the conversation, the most significant difference being that the affidavit stated that Juror Gause was "in and out of the room frequently" during the discussion with the third relative concerning the existence of Black Sunday:

"At one point during the trial, my cousin and I spent the night at the home of a relative of mine in the Bronx. My relative and I discussed some aspects of the case during the evening. My cousin was in and out of the room frequently during our discussion. Among the subjects we discussed was the fact that Black Sunday was still in operation and on the street."

(Affidavit of Kibra Phillips, ¶ 3).

mined that, under the circumstances, it would not be appropriate to halt the deliberations and conduct an inquiry:

"I think that the way for me to handle this is to go ahead and find out what the verdict of the jury is with regard to the various counts still remaining, . . . and if anything is to be done about the material which you have brought to my attention, which as I say leaves me confused rather than anything else, it would have to be done in a formal manner by motion to set aside such verdicts as have already been found against Mr. Hillard or anyone, if there are anymore, and we would have to get people in and swear them and hear what they have to say."

(Transcript at 2117).

Hillard now moves for a new trial, or, in the alternative, for a hearing to determine the extent and the nature of any extra-record communications which may have come to the attention of the jury.

\* \* \* \* \* \*

Having carefully considered the submissions of the parties, particularly in light of the recent rulings of the Second Circuit, we now conclude that further inquiry into the conduct of the jury is not warranted. Hillard's primary argument is that communication to a juror of extra-record information is presumptively prejudicial, and that the content of the information revealed or possibly revealed is on its face so prejudicial as to preclude the possibility of a fair verdict. Further, Hillard argues that the jury may have become aware of other extra-record information that has not, as yet, come to light, and that a hearing is needed to ascertain whether, and to what extent, that may have occurred. The basis of this contention is the proposition that the jury's deliberations, were characterized by substantial "turmoil" (Breitbart Affidavit, ¶ 12), in conjunction with the fact that Juror Gause had already conceded to having ignored her instructions to refrain from discussion of the case during the trial.

The government responds that the extra-record discussions which have come to light

are harmless, particularly in view of the prompt curative instructions which were given. As to the possibility of the existence of further extra-record conversations, the government argues that an adequate inquiry has already been made—the juror who engaged in the improper behavior has already been questioned by the Court under oath as to the extent of her extra-record discussions and found to be credible.

\* \* \* \* \* \*

 Extra-record information communicated to a juror is "deemed presumptively prejudicial." *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). However, the government may rebut the presumption by showing that the communication was harmless. *Sher v. Stoughton,* 666 F.2d 791, 793 (2d Cir. 1981) (Feinberg, J.). To determine whether the communication was harmless, it is necessary to consider not only the content of the communication itself, but also "the other information of which the jurors were properly aware." *Sher v. Stoughton, supra* at 794. As Judge Friendly explained in *United States ex rel. Owen v. McMann,* 435 F.2d 813, 813 (2d Cir. 1970):

"The touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter, . . . but the nature of what had been *infiltrated* and the probability of prejudice."

 As to the first two items of extra-record information, Breitbart's professional history and the custodial status of the defendants, the probability of prejudice is low. It would not be surprising to an average juror if he learned that a defendant had retained an attorney experienced in defending others accused of similar crimes. Moreover, the government cannot be made chargeable for any discussion arising from a defendant's voluntary retention of a well-known attorney. Furthermore, it is difficult to discern any basis for the defendant's contention that the jury's knowledge that his attorney had previously been a prosecutor could prejudice him.

■ With respect to the defendant's custodial status, a defendant does have a legitimate concern with concealing such information from the jury—it is possible that some jurors will not be aware of the limited purposes of pretrial custody and draw inaccurate conclusions from the knowledge that certain defendants are at liberty while others are on bail. However, as soon as that matter came to light, a cautionary instruction was given which we believe alleviated any confusion which the jurors might otherwise have experienced, thereby eliminating any real possibility of prejudice.

■ The third item of information presents a somewhat different question. It appears that a juror may have received, outside of the "laboratory conditions" of the courtroom, information which confirmed the government's allegation of the existence of the "Black Sunday" heroin network. This possibility raises the defendant's right to confront the witnesses against him. Moreover, the existence of a heroin network was an essential element of the government's case—it was, in fact, the *corpus delicti.*

However, *Sher v. Stoughton* teaches that there are circumstances in which extra-record communications may concern a matter as to which the evidence *properly* admitted was so great that the extra-record communication may be cumulative and non-prejudicial. In *Sher,* jurors received anonymous telephone calls during the course of a murder trial in which they were sitting. One juror was told that the defendant had a prior record and that his co-defendant had been sentenced to death. However, the trial record had included properly admitted evidence that the defendant had had a substantial record, and "the co-defendant's guilt was virtually admitted." *Id.* at 794. Accordingly, the Court held that: "Considering the substantial evidence of Sher's prior bad acts that was admitted into evidence . . . evidence of any further criminal record would have been cumulative." *Id.*

The *Sher* rule is applicable in the instant action. While the existence of a heroin network was an essential element of the government's case, the evidence admitted at trial on that point was overwhelming. In fact, on summation, Hillard's attorney stated, "there is overwhelming evidence of a narcotics conspiracy if I have ever seen it in my life, and this is not my first case" (Transcript at 1737). The evidence as to whether the network was known as Black Sunday may have been somewhat less devastating; however, the government was not obligated to prove that the network was named Black Sunday, or that it had any name at all. The critical elements of the government's case were the existence of the network and defendant's participation in it. On the former, the proof admitted at trial was, as indicated above, undisputed by Hillard; on the latter, the jury received no extra-record information.

■ On the question whether a hearing is required to determine whether any further extra-record information came to the attention of the jury, we agree with the government that sufficient inquiry has already been made. Juror Gause has already been questioned as to whether she had informed the Court as to the full extent of her communications on the case during the trial, she responded in the affirmative, and we found her to be credible. No purpose would be served by holding a hearing to ask her the same question again. While the affidavit of Kibra Phillips is first hand evidence and contains more detail concerning the conversations, nevertheless, the affidavit is substantially in conformity with the earlier oral report made to the Court by attorney Breitbart and adds nothing of substance. In sum, as indicated above, the facts do not warrant the invocation of a post-verdict inquiry.

"There is a judicial reluctance, for sound and easily understood reasons, 'to inquire into the state of mind of any juror and into the conduct of jurors during their deliberations.' *United States v. Dioguardi,* 492 F.2d 70, 79 (2d Cir. 1974). This is to avoid harassment of jurors, inhibition

of deliberation in the jury room, a deluge of post-verdict applications mostly without real merit, and an increase in opportunities for jury tampering; it is also to prevent jury verdicts from being made more uncertain. *United States v. Crosby,* 294 F.2d 928, 950 (2d Cir. 1961), *cert. denied,* 368 U.S. 984 [82 S.Ct. 599, 7 L.Ed.2d 523] (1962). To overcome this reluctance and to authorize a post-verdict inquiry, there must be 'clear evidence', 'strong evidence', 'clear and incontrovertible evidence', 'substantial if not wholly conclusive evidence.'" *United States v. Dioguardi* at 78, 79, 80.

*King v. United States,* 576 F.2d 432 (2d Cir. 1978).

\* \* \* \* \* \*

■ Finally, Hillard asserts that he should be entitled to a new trial because of the substitution of the alternate juror after one of the regular jurors became ill during deliberations.

We are aware that the courts and commentators cited by Hillard have disagreed with our judgment concerning the propriety of substituting alternates after the commencement of deliberation, and we recognize that there are circumstances in which such a practice may create a danger of prejudice. However, there seemed little likelihood of prejudice in the present case. At the time the alternate was substituted, the jury was cautioned with emphasis to "start from scratch in the review of the evidence" and that "a jury verdict must be the product of the deliberations of all twelve people who reach that verdict." (Transcript at 2079–80). The jury consistently impressed us as unusually conscientious and attentive, and there seemed no reason to doubt their ability and willingness to follow the instructions to begin deliberations anew or that they actually did begin anew.

Moreover, this is not a case like *United States v. Lamb,* 529 F.2d 1153 (9th Cir.

1975) (en banc) in which a jury had deliberated for four hours prior to the substitution of the alternate and then reached a verdict twenty-eight minutes later, leading the court to conclude that "impermissible coercion upon the alternative juror was manifestly inherent, and ... there was not ... conscientious, careful reconsideration by the twelve of the newly constituted jury." *Id.* at 1157. To the contrary, the newly-constituted jury in the instant case labored for two long days. The conscientiousness with which it performed its role is reflected by the many requests to hear further testimony, to see exhibits, and to receive further instructions which were made subsequent to the substitution of the alternate.[2]

The Fifth Circuit has taken an approach similar to ours on the question of the substitution of alternate jurors. In *United States v. Phillips,* 664 F.2d 971 (5th Cir. 1981), the court noted that "the most substantial concern about substitution of an alternate juror after deliberations have begun is that the alternate might be coerced by jury members who might have already formulated positions or viewpoints or opinions." *Id.* at 995. However, the court went on to note that it is possible for the trial court to utilize "safeguards" to "neutralize the possible prejudice" to the defendants, *Id.* at 996, such as instructing the jurors to begin their deliberations anew and to work with the alternate "from a clean slate." Moreover, the court noted that a request for a new trial must be considered "in light of the purpose of federal rules of criminal procedure: 'to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay.' Fed.R.Cr.Pr. 2."

At the time that the question arose, we felt that it would have been an enormous and unnecessary waste to retry the entire case because of the unfortunate illness of one juror, particularly in view of our strong impression that the jury would follow in-

---

**2.** The record discloses that after the substitution, the jury made seven requests to rehear testimony, eight requests to see exhibits, and three requests for further instructions.

structions and reconsider the case against each remaining defendant from scratch. We believe that the course of deliberations subsequent to the substitution bears out that impression. Accordingly, we find no prejudice to the defendant has resulted from the substitution of the alternate.

Rule 33 provides that a new trial may be granted if "required in the interest of justice." Having determined that the defendant was not prejudiced by either the small amount of extra-record information which reached the jury or the substitution of the alternate, we conclude that it would not be "in the interest of justice" to grant a new trial.

Defendant's motion for a new trial is denied.

It is so ordered.