**UNITED STATES of America, Appellee,**

v.

**James HILLARD, Robert Allen and Samuel Hillard, Defendants-Appellants.**

Nos. 725, 726, 727, Dockets 82–1312, 82–1313, 82–1322.

United States Court of Appeals, Second Circuit.

Argued Jan. 14, 1983.

Decided March 1, 1983.

Certiorari Denied May 31, 1983. See 103 S.Ct. 2431.

---

See also, D.C., 542 F.Supp. 487; D.C., 546 F.Supp. 1351.

Mary Lee Warren, Asst. U.S. Atty., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Gerard E. Lynch, Roanne L. Mann, Asst. U.S. Attys., New York City, of counsel), for appellee.

Edward M. Chikofsky, New York City (David Breitbart, Maurice Sieradzki, New York City, of counsel), for defendants-appellants.

Before FEINBERG, Chief Judge, and CARDAMONE and DAVIS,* Circuit Judges.

FEINBERG, Chief Judge:

Defendants-appellants James Hillard, Samuel Hillard, and Robert Allen appeal from judgments of conviction entered in the United States District Court for the Southern District of New York, Morris E. Lasker, J., on various counts stemming from their participation in a large-scale heroin operation. Three issues are raised on this appeal, involving the admission of certain evidence derived from electronic surveillance, alleged juror misconduct, and the substitution of an alternate for a juror who fell ill shortly after deliberations had begun in James Hillard's trial. For the reasons stated below, we affirm the judgment of the district court in all respects.

According to the government, the defendants were all part of an extensive heroin distribution network headed by James Hillard and informally known as "Black Sunday."[1] The ·Black Sunday ring evidently prospered for at least four years, amassing millions of dollars in profits. The indictment charged eleven defendants in eight counts for offenses related to the Black Sunday operation. Appellants were charged with conspiracy to distribute and to possess with intent to distribute large quantities of heroin, in violation of 21 U.S.C. § 846, conspiracy to use firearms to commit a federal felony, in violation of 18 U.S.C. § 371, and distribution and possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a). In addition, James Hillard was charged with supervising a continuing criminal enterprise, in violation of 21 U.S.C. § 848.

After extensive pre-trial motions, hearings and arguments, trial began on June 14, 1982. Midway through the trial, Robert Allen and Samuel Hillard pled guilty to all of the charges against them, but preserved their right to appeal the denial of their motions to suppress electronic surveillance evidence. The trial concluded in early July, when the jury found James Hillard guilty of all but one of the charges against him,[2] and reached varying results with respect to the other defendants.

Robert Allen was sentenced to five years in prison and five years special parole. Samuel Hillard was sentenced to seven and one-half years in prison, and three years special parole. James Hillard received a sentence of twenty years in prison to be followed by ten years special parole.

I. *The Replacement of a Juror During Deliberations*

The jury retired to commence deliberations on June 30, 1982. After two and

---

* Honorable Oscar H. Davis of the United States Court of Appeals for the Federal Circuit, sitting by designation.

1. · According to government informants, the network was named Black Sunday because dealers bragged that it would be a black Sunday when they ran out of heroin to sell.

2. James Hillard was acquitted of one substantive heroin distribution charge.

one-half days of deliberations, followed by a three-day holiday recess, one of the jurors informed the district court that she was ill. At that point in the trial, the first two alternates were still available. There is no dispute that the court had instructed the two alternates to remain in attendance during the deliberations in case they were needed; they were kept separated from the regular jurors, but they joined the jury whenever it returned to the courtroom to hear testimony reread or to receive additional jury instructions.

Judge Lasker discussed with counsel several possible courses of action. Defendants refused to stipulate to an eleven-juror verdict, see Fed.R.Crim.P. 23(b), and also objected to the government's proposal that the court order a one-day adjournment in the hope that the ill juror might then be able to return. Judge Lasker did not wish to suspend deliberations because he felt the ill juror's return was uncertain, and because he thought a further delay in deliberations, after the three-day holiday recess, might unduly tax the jurors. Judge Lasker also did not wish to declare a mistrial, because he felt it would be an "enormous and unnecessary waste." Accordingly, he decided to substitute one of the alternates for the ill juror.

Appellant James Hillard [3] now offers a number of reasons why this action was reversible error. First, appellant argues that the district court should have ordered a one-day continuance in the hope that the ill juror might recover and be able to resume deliberations. Defendant notes that the ill juror informed the trial court that she was "usually not sick very long." From this defendant concludes that the juror's illness was not a sufficiently serious problem to justify the immediate substitution of the alternate, when there was no indication that the less drastic remedy of a brief continuance would not have sufficed. In support of this argument, defendant cites this court's decision in *Dunkerley v. Hogan*, 579

F.2d 141 (2d Cir.1978), cert. denied, 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). We find this argument somewhat disingenuous. First, defendant James Hillard did not accede to a one-day continuance when it was suggested by the government in open court to Judge Lasker; appellant consistently sought only a mistrial. Second, *Dunkerley* holds that it is inappropriate to declare a mistrial when it does not appear that a mistrial is manifestly necessary because there is no "record evidence or statement by the court indicating why a short continuance would have been unreasonable, unfair, or impractical . . . ." Id. at 148. In this case, the district judge gave plausible reasons as to why a continuance was inappropriate; moreover, he decided to substitute a juror precisely in order to avoid the even more drastic remedy of declaring a mistrial, which was the remedy sought by defendant.

Before proceeding with the substitution, the district court interviewed the alternates. They admitted to having discussed the case with each other "in a general sense." The first alternate acknowledged that he had formed a tentative opinion with respect to each defendant, but indicated that he could deliberate fully and fairly with the eleven regular jurors and, if necessary, could change his views in light of the evidence and the law. He also indicated that his discussions with the other jurors had not affected his view of the case. Judge Lasker discussed the matter further with counsel, and then decided to proceed with the substitution.

Judge Lasker informed the full jury of the substitution, and instructed them to begin their deliberations "from scratch." 546 F.Supp. 1351. Over a two-day period, the jury returned several separate verdicts: first, they found James Hillard guilty on the conspiracy counts, but acquitted another defendant on all counts against him; later, they found James Hillard guilty of one substantive count, but not guilty of

---

**3.** Since Samuel Hillard and Robert Allen pled guilty midway through the trial, the juror substitution issue and the juror misconduct issue discussed later affect only appellant James Hillard.

another, and acquitted another defendant; on the following day, the jury convicted one defendant of conspiracy, and convicted James Hillard on the continuing criminal enterprise count.

Appellant James Hillard contends that the substitution of the alternate juror violated his Sixth Amendment rights, and the plain language of Rule 24(c) of the Federal Rules of Criminal Procedure. This is an important issue in the administration of criminal justice in this circuit, and has not been directly ruled upon by this court. We therefore consider it at some length.

In a case closely analogous to this one, the Fifth Circuit held that the substitution of an alternate after the commencement of deliberations was harmless error. *United States v. Phillips,* 664 F.2d 971 (5th Cir. 1981), cert. denied, —— U.S. ——, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); accord, *United States v. Kopituk,* 690 F.2d 1289 (11th Cir.1982). The circumstances of the substitution in *Phillips* were as follows: After a lengthy trial, the judge ordered one of the alternate jurors to be separately sequestered but not dismissed. After two days of deliberations, one of the jurors suffered a heart attack and was unable to continue. The district court questioned the alternate juror and found that he had not discussed the case with anyone and felt able to work from the start with the other jurors. The court also questioned the regular jurors, who indicated that they would be able to begin their deliberations anew. The court substituted the alternate over the objection of defense counsel, and instructed the jury to start their deliberations over again. Six days later the reconstituted jury reached a verdict.

As an initial matter, the *Phillips* court determined that the federal constitution does not proscribe the substitution of an alternate juror after deliberations have begun ("post-submission substitution"). *United States v. Phillips,* supra, 664 F.2d at 992; see also *Johnson v. Duckworth,* 650 F.2d 122 (7th Cir.), cert. denied, 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169 (1981); *Henderson v. Lane,* 613 F.2d 175, 177–79 (7th Cir.),

cert. denied, 446 U.S. 986, 100 S.Ct. 2971, 64 L.Ed.2d 844 (1980); *People v. Collins,* 17 Cal.3d 687, 131 Cal.Rptr. 782, 552 P.2d 742 (Cal.1976), cert. denied, 429 U.S. 1077, 97 S.Ct. 820, 50 L.Ed.2d 796 (1977); Preliminary Draft of Proposed Amendments to the Federal Rules of Criminal Procedure, Advisory Committee Note to Rule 24(c), 91 F.R.D. 289, 344 (1981).

In *Henderson v. Lane,* supra, a juror suffered a heart attack two and one-half hours after deliberations had begun. The district court recalled the two alternate jurors, and questioned them about their activities since they had been discharged. The first alternate admitted that he had discussed the case with his wife, but stated that she had not expressed an opinion. He also stated that he had not reached a conclusion regarding the defendant's guilt. Defense counsel acquiesced in the reinstatement of the alternate, but the defendant was not personally present when the substitution was made. The Seventh Circuit held that substitution is constitutional, but that the defendant had the right to be present at the time of substitution. Nonetheless, the jury's verdict was upheld, because the Seventh Circuit determined that the defendant had suffered no prejudice and that the error was therefore harmless. The Seventh Circuit posed the issue as follows:

> In determining the constitutionality of the substitution procedure, we must consider whether the procedure preserves the "essential feature" of the jury, defined by the Supreme Court as
>
> > the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence.
>
> *Williams v. Florida,* 399 U.S. 78, 100 [90 S.Ct. 1893, 1905, 26 L.Ed.2d 446] (1970).

*Henderson v. Lane,* supra, 613 F.2d at 177.

■ We think that the "essential feature" of the jury was preserved in the case now before us. The alternates were chosen along with the regular jurors and by the

same procedures. They heard all the evidence and the instructions on the law with the regular jurors. Moreover, the alternate chosen to replace the ill juror reaffirmed his ability to consider the evidence and deliberate fairly and fully, and he indicated that his discussions with the other alternate did not change his view of the case. The trial judge instructed all the jurors to begin their deliberations anew, explaining that "a jury verdict must be the product of the deliberations of all twelve people who reach that verdict." Thereafter, during the course of its deliberations over a two-day period, the jury made frequent requests for exhibits, testimony, and instructions, which suggests that its verdict was the product of the thought and mutual deliberation of all twelve jurors, including the alternate. Moreover, the length of deliberations and the discriminating verdicts reached also support the district court's conclusion that the defendants suffered no prejudice by the substitution of the alternate. Under these circumstances, we find there was no constitutional impediment to the replacement of the ill juror.

Appellant's principal challenge to the substitution of the alternate, however, is based on Rule 24(c) of the Federal Rules of Criminal Procedure, which provides in relevant part:

> Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable to perform their duties . . . .
> An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict.

According to appellant, the decision to substitute a juror after commencement of deliberations is a flat violation of the rule, requiring reversal.

█ It has been suggested that the rule does not prohibit a court from discharging an alternate and subsequently reconstituting him as a juror to replace a regular juror who is unable to continue after deliberations have begun. See *United States v. Evans*, 635 F.2d 1124, 1127 (4th Cir.1980),

cert. denied, 452 U.S. 943, 101 S.Ct. 3090, 69 L.Ed.2d 958 (1981). We agree with appellant, however, that the effect of the rule is to restrict the permissible time period for the replacement of a regular juror to the period prior to the commencement of deliberations.

The genesis of Rule 24(c) supports this conclusion. The first draft, prepared in September 1941 as then proposed Rule 47(b), contained the following language:

> An alternate juror who does not replace a principal juror shall be discharged after the jury returns its verdict or earlier in the discretion of the court.

L. Orfield, Criminal Procedure under the Federal Rules 87 (1966). This language, which would permit juror substitution during deliberations, changed several times as the Advisory Committee prepared new drafts of the rule. A later draft dated May 18, 1942, provided that:

> An alternate juror before the jury retires shall remain under order of the court and shall not be discharged until the principal jurors are discharged.

Id. at 89. Again, this language would have permitted the post-submission substitution of an alternate. This draft was submitted to the Supreme Court for comment. The Court inquired, among other things, whether the rules committee "had satisfied itself that it is desirable or constitutional that an alternate juror may be substituted after the jury has retired and begun its deliberations?" Id. at 90. Nonetheless, this provision survived in substance until comments on a May 1943 draft were received objecting to substitution of a juror after the case was submitted to the jury on the grounds that "[t]he members of the regular jury might bring such influence on a dissenter as to disable him and then require an alternate," and that "[t]he alternate may have been exposed to improper influences before he takes part as he does not previously sit in the jury room." Id. at 94. The next draft of the Rule, apparently in response to the doubts of the Supreme Court and to these objections, was written essentially as it appears now.

It is apparent then that the drafters of Rule 24(c) did not envision post-submission substitution, but expected instead that alternate jurors would be finally discharged when the regular jurors retire. As this court stated in *United States v. Hayutin,* "[t]he provision of Rule 24(c) that an alternate juror who does not replace a regular juror 'shall be discharged after the jury retires to consider its verdict' is a mandatory requirement . . . ." 398 F.2d 944, 950 (2d Cir.), cert. denied, 393 U.S. 961, 89 S.Ct. 400, 21 L.Ed.2d 374 (1968) (dictum). But as the Fifth Circuit noted in *Phillips,* "[t]he question . . . is whether the appellants were prejudiced by the substitution of the alternate after jury deliberations had begun." 664 F.2d at 993. We agree with the *Phillips* court that a violation of Rule 24(c) does not require reversal per se, absent a showing of prejudice. In *Hayutin,* the district court failed to discharge three alternates after the jury retired to consider its verdict. Although the alternates never participated in the jury deliberations in any way, this court acknowledged that their continued service itself constituted a violation of Rule 24(c).[4] Nonetheless, the court refused to overturn the verdict because the record indicated that the defendants were not prejudiced by the violation. 398 F.2d at 950. Accord, *United States v. Allison,* 481 F.2d 468, 472 (5th Cir.), aff'd after remand, 487 F.2d 339 (5th Cir.1973), cert. denied, 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 759 (1974); cf. *United States v. Evans,* supra, 635 F.2d 1124, 1127–28 (defendant may stipulate to substitution after deliberations have begun); *Leser v. United States,* 358 F.2d 313, 317 (9th Cir.), cert. denied, 385 U.S. 802, 87 S.Ct. 10, 17 L.Ed.2d 49 (1966) (same).

The possible prejudice that concerned the *Hayutin* court, "that a defendant runs the risk of being tried by more than the twelve jurors guaranteed to him by the Constitution and the Rule, or . . . of being tried by more than one jury," 398 F.2d at 950, was not a danger in this case. As this court made clear in a later opinion in the same case, *United States v. Nash,* 414 F.2d 234, 236 (2d Cir.), cert. denied, 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242 (1969), the principal fear in *Hayutin* was that the alternates might be in a position to influence the deliberations of the twelve regular jurors. But that problem did not arise here since the regular jurors were kept apart from the alternates until the need for a substitution arose. It is significant that the Fifth Circuit, which has criticized the practice of permitting alternates to be present during jury deliberations, see *United States v. Allison,* supra, 481 F.2d at 472, has permitted juror substitution after deliberations have begun, see *United States v. Phillips,* supra, 664 F.2d at 991–93.

James Hillard argues that the substitution here was prejudicial because the alternate admitted not only to having discussed the case, but also to having formed preconceptions as to the guilt of each defendant. In appellant's view, the case was decided by fourteen jurors; the initial twelve jurors, who discussed the case among themselves, the first alternate, who later joined them, and the second alternate, whose views were imparted to the first alternate, and conceivably through him to the other jurors. But we think the case was properly decided only by the twelve members of the reconstituted jury. As noted above, the alternate juror informed the district court that he was not swayed by his discussions of the case with the other alternate, and that he felt himself able to deliberate fully and fairly. Moreover, the regular jurors were carefully instructed to start from scratch. Judge Lasker found that they were able to do so in the ensuing deliberations over two days, and

4. The *Hayutin* court went on to say in dicta that:

> In the face of the mandatory requirement of Rule 24(c) and the Committee's failure at the time of its adoption to include a proposal to permit an alternate juror to replace a regular juror during the deliberations, it is difficult to understand what purpose is to be served by retaining the alternate jurors once the case has been submitted. . . .
>
> . . . .
>
> The absence of benefit being so clear and the danger of prejudice so great, it seems foolhardy to depart from the command of Rule 24.

*United States v. Hayutin,* 398 F.2d at 950.

there is no indication in the record to the contrary. The *Phillips* court concluded that the procedural precautions followed by the trial court in that case "obviated the danger of prejudice to appellants and overcame the concerns of the draftsmen of Rule 24(c)." *United States v. Phillips,* supra, 664 F.2d at 993. We think the precautions taken by the trial judge similarly obviated the danger of prejudice in this case.

Appellant relies principally on *United States v. Lamb,* 529 F.2d 1153 (9th Cir.1975) (in banc), to support his argument that substitution of an alternate juror during deliberations is necessarily reversible error. See also *People v. Ryan,* 19 N.Y.2d 100, 278 N.Y.S.2d 199, 224 N.E.2d 710 (1966); *State v. Berberian,* 411 A.2d 308, 310 (R.I.1980).[5] In *Lamb,* the Ninth Circuit, sitting in banc, reversed a bank robbery conviction because of the district court's failure to comply with the "plain requirements" of Rule 24(c). According to the Ninth Circuit:

> The Rule is phrased in mandatory terms for what many have thought to be sound reasons. Among such reasons are: The inherent coercive effect upon an alternate juror who joins a jury that has, as in this case, already agreed that the accused is guilty is substantial. Moreover, such a procedure significantly limits the accused's right to a mistrial if the original jury cannot reach agreement. A lone juror who could not in good conscience vote for conviction could be under great pressure to feign illness or other incapacity so as to place the burden of decision on an alternate juror.

*United States v. Lamb,* 529 F.2d at 1156 (footnotes omitted).

In *Lamb,* the regular jurors returned a verdict of guilty after four hours of deliberations spread over two days. The judge refused to accept the verdict, which he considered inconsistent with the instructions. At that point, one of the regular jurors became unable to continue. The judge decided to substitute an alternate, and instructed the jury to "begin from the beginning." *United States v. Lamb,* 529 F.2d at 1155. Twenty-nine minutes later, the jury reached a verdict of guilty. The Ninth Circuit observed that "The inherent coercive effect upon an alternate juror who joins a jury that has ... already agreed that the accused is guilty is substantial." Id. at 1156. According to the majority, the existence of impermissible coercion, and the lack of careful reconsideration by the newly constituted jury, were evidenced by the brevity of the new jury's deliberations. Nonetheless, the majority indicated that the brevity of deliberations was "not a factor contributing to our conclusion in this case. The mandatory provision of Rule 24 having been violated, the period of time during which the substitute juror participated in the deliberations is essentially irrelevant." Id. at 1156 n. 7.

In this case, however, unlike the situation in Lamb, there is no suggestion in the record of a coercive effect on the alternate juror. Nor does it appear that the excused juror was under pressure to feign illness. Judge Lasker observed that the ill juror appeared to be responsible and did not seem inclined to avoid her duties. Moreover, as Judge Lasker also noted, the reconstituted jury seems to have conscientiously reconsidered the case as instructed. As the dissenters in *Lamb* observed:

> Rather than to presume misconduct, as would the majority, our role more appropriately is to presume that the jury has complied with the court's instructions and admonitions, absent evidence to the contrary.

Id. at 1160.[6]

Most commentators considering this issue have objected to post-submission substitu-

---

**5.** Although appellant cites *Berberian* to support his position on juror substitution, that case explicitly leaves open the issue before us here. 411 A.2d at 410 n. 3.

**6.** The *Lamb* dissenters felt, as do we, that "[t]he central issue in these cases is whether the violation of Rule 24(c) is prejudicial to the defendant." 529 F.2d at 1161. They disapproved of the notion of a per se rule of reversal, and argued that it was particularly inappropri-

tion for essentially the reasons given by the majority in *Lamb,* and voiced to the original Rules Committee. See, e.g., 2 C. Wright, Federal Practice and Procedure § 388, at 393 (1982) ("substitution subject to practical difficulty and to possible constitutional objection"); 8A J. Moore, Moore's Federal Practice ¶ 24.05, at 24–59 (1982). But we think there is a clear need for some procedure short of a mistrial that would permit the fair and efficient resolution of a case once deliberations have begun and a juror becomes unable to continue jury service. The current Advisory Committee on Criminal Rules has expressed precisely this concern:

> The problem is acute when the trial has been a lengthy one and consequently the remedy of mistrial would necessitate a second expenditure of substantial prosecution, defense and court resources. . . .
>
> . . . .
>
> It is the judgment of the Committee that when a juror is lost during deliberations, especially in circumstances like those in *Barone* and *Meinster,* it is essential that there be available a course of action other than mistrial.

Preliminary Draft of Proposed Amendments to the Federal Rules of Criminal Procedure, 91 F.R.D. 338, Advisory Committee Note 23(b) (1981).[7]

To solve this problem, the Rules Committee formulated two alternatives: (1) amend Rule 23(b) to permit an eleven-juror verdict at the discretion of the court, and (2) amend Rule 24(c) to permit explicitly the substitution of a juror during deliberations, provided that the judge instructs the jury to begin

its deliberations anew, as the district judge did in this case. The Rules Committee expressed a strong preference for the first alternative. In its view, the juror substitution alternative is problematic because:

> Even were it required that the jury "review" with the new juror their prior deliberations or that the jury upon substitution start deliberations anew, it still seems likely that the continuing jurors would be influenced by the earlier deliberations and that the new juror would be somewhat intimidated by the others by virtue of being a newcomer to the deliberations.

Id. at 341. In our view, these dangers may be adequately minimized by careful instructions and supervision from the trial court. But in any event, as the Advisory Committee recognized, either alternative may be preferable to the declaration of a mistrial.

Moreover, in this case the district court did not have the alternative of an eleven-juror verdict, since defendants refused to stipulate to that procedure, as required by current Rule 23(b). Under these circumstances juror substitution seems, as the Rules Committee noted with respect to the use of that procedure in *United States v. Meinster,* 484 F.Supp. 442 (S.D.Fla.1980), aff'd sub nom. *United States v. Phillips,* 664 F.2d 971 (5th Cir.1981), cert. denied, —— U.S. ——, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982), and *United States v. Barone,* 83 F.R.D. 565 (S.D.Fla.1979), aff'd sub nom. *United States v. Kopituk,* 690 F.2d 1289 (11th Cir.1982), "the least objectionable course of action." Preliminary Draft of Proposed Amendments to the Federal Rules

---

ate when an alternate is substituted for a regular juror, as contrasted with cases in which alternates are permitted to sit in on the deliberation of regular jurors, since in the latter cases the privacy of jury deliberations is violated. Id. at 1160 (citing *United States v. Beasley,* 464 F.2d 468, 470 (10th Cir.1972)).

The dissenters urged instead the adoption of an approach calling for an evidentiary hearing on remand as to the possibility of prejudice. In *Lamb* itself, however, they felt a remand was unnecessary because the district court had already considered the issue. The dissenters argued that the defendants had impliedly waived the Rule 24(c) requirement that the alternates

be discharged by failing to object to the trial court's announced decision to keep the alternates on call. We do not rely on a theory of implied waiver in this case, since it is the first time this court has squarely considered the post-submission substitution issue; moreover, although appellant did not object when the district court decided to retain the alternates at the close of trial, his subsequent objection, made prior to the actual substitution of the alternate, was enough to preserve his rights.

**7.** Both *Meinster* and *Barone* are discussed in more detail below.

of Criminal Procedure, supra, 91 F.R.D. at 340.[8]

Appellant attempts to distinguish *Meinster* (and presumably *Barone*) on the ground that those cases were unusually long and complex, thus rendering the declaration of a mistrial exceedingly undesirable. *Meinster,* for example, involved twelve defendants in a 36-count, 100-page indictment for RICO violations and related offenses; trial in that case lasted over four months. The Fifth Circuit, in affirming the trial court's decision to replace a juror after the start of deliberations, explicitly limited its holding to the "exceptional context" of that "most complex and protracted trial." *United States v. Phillips,* supra, 664 F.2d at 996. Similarly, when the 11th Circuit affirmed the *Barone* decision on the basis of the *Phillips* precedent, it also limited its decision:

> Our decision that substitution of the alternate juror after deliberations had begun does not constitute reversible error should not be misconstrued as a stamp of approval upon such a practice. As was true in *Phillips,* the trial court's decision to substitute the alternate was made in the context of a trial of truly epic proportions in terms of length, scope and expense to both sides. . . .

> It is not our intention, nor is it within our province, to authorize routine deviation from the terms of Rule 24(c). That rule is "the rule" and the substituted juror procedure upheld herein is à narrowly limited exception to the rule, applicable only in extraordinary situations and, even then, only when extraordinary precautions are taken, as was done below, to ensure that the defendants are not prejudiced.

*United States v. Kopituk,* supra, 690 F.2d at 1311.

■ We agree with the *Phillips* and *Kopituk* courts that, pending a change in the rule, juror substitution should be permitted only in complex cases where thorough precautions are taken to ensure that the defendants are not prejudiced. While this trial was not as prolonged as those in the cases just mentioned, we think that the rule just stated applies, at least in the absence of any other alternative short of a mistrial. We express no opinion on what our view would be if and when revised Criminal Rule 23(b) becomes effective. The trial below lasted over three weeks, involved nine defendants, and filled over two thousand pages of transcript. The district judge made painstaking efforts to minimize the potential prejudice to the defendants, and determined after the verdict that no prejudice had been sustained. Thus, we think the district court properly acted in furtherance of the federal rules of criminal procedure "to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." Fed.R.Crim.P. 2.

## II. *Admission of Wiretap Evidence*

■ The two additional claims raised on appeal are more easily resolved. All three appellants contend that the district court erred in refusing to suppress evidence derived from electronic surveillance because the initial wiretap authorizations in this case were not adequately supported by probable cause. Defendants focus on the initial state order[9] entered by the New Jersey Superior Court in September 1981

---

**8.** We are aware that the version submitted to the Supreme Court by the United States Judicial Conference Committee on the Rules of Practice and Procedure omitted the juror substitution option. The remaining 11-member jury option has not been approved yet by the Court or, a fortiori, submitted to Congress.

**9.** The government argues that only James Hillard has standing to challenge the state interception order since the order was directed only

at him. Appellants claim they all have standing to challenge the New Jersey order since Samuel Hillard and Robert Allen were intercepted over wiretapped telephones as well as James Hillard, and since the later wiretap orders all built on this first one. We need not resolve this question, however, since we find adequate probable cause existed to support this first order as well as the later ones.

upon the application and affidavit of Captain Richard J. Mason of the Union County Detectives (New Jersey), on the theory that the tapes obtained as a result of this order were used as the predicate for the subsequent wiretap orders. We find that there was adequate probable cause for the issuance of the New Jersey wiretap authorization, and thus for the subsequent authorizations as well.

The state order authorized interception of the conversations of James Hillard and others on the telephones at James Hillard's New Jersey residence. The government focused on Hillard because it believed he was a major heroin dealer, and the leader of the organization under investigation. The Mason affidavit, adduced in support of the government wiretap application, runs 53 pages and describes in considerable detail the investigations into James Hillard's activities conducted by the White Plains Police Department, the Drug Enforcement Administration, and the New York Police Department. The investigations involved physical surveillance, interviews with informants, landlords, and building managers, and a pen register and toll analysis of James Hillard's telephone at a previous address. The information derived from these investigations, and stated in the affidavit, is carefully summarized in Judge Lasker's opinion denying defendants' pre-trial suppression motion. 542 F.Supp. 487. The information reveals, in brief, that informants told investigators that James Hillard headed a multi-million dollar heroin ring, and described in some detail its scope, personnel, and the supplies involved. Informants also described two heroin sales in which James Hillard was allegedly personally involved, one in February 1980, and the other in February 1981. Finally, the surveillance, telephone records, and pen register revealed a pattern of surreptitious activity, contacts with known or suspected drug dealers, and large, unexplained cash expenditures.

Defendants claim this information was too conclusory and lacking in corroborative evidence to support a finding of probable cause. They argue that despite extensive physical surveillance, no demonstrable illegal activity was observed. At most, they claim, James Hillard was seen with known narcotics traffickers. They characterize the informant information as only "generalized rumor" that Hillard was a narcotics boss, with no corroborative detail, and therefore insufficient under *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Appellants dismiss the telephone toll records and pen register evidence as inconclusive at best, showing only that some of the defendants knew each other. Finally, appellants criticize the probable cause value of the two narcotics transactions involving James Hillard. With respect to the 1981 transaction, they claim there was no indication of the informant's reliability other than a conclusory statement that he had been reliable in the past, and that there was virtually no corroborative detail supplied by the informant as to the date, time, and place of the alleged purchase from Hillard. Appellants argue further that the alleged 1980 sale is too stale to support a present inference about Hillard, and too lacking in any factual basis for the informant's assertion that the heroin came from Hillard.

Judge Lasker carefully considered these arguments, but concluded that when the New Jersey affidavit is viewed as a whole and "in a common-sense and realistic fashion," *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965), it established the requisite probable cause, see 18 U.S.C. § 2518(3). Judge Lasker noted that the government adequately established the reliability of the informants by reciting past information supplied by each that led to an arrest and conviction, or was independently corroborated. See *United States v. Sultan,* 463 F.2d 1066, 1069 (2d Cir.1972). But he also found that much of the informant information was merely conclusory. Nonetheless, he determined, and we agree, that probable cause was adequately established because in addition to

the conclusory statements there was sufficient specific informant information bolstered by independent investigations of law enforcement personnel. For example, the two heroin transactions in which Hillard was personally involved confirm that James Hillard did participate to some extent in heroin trafficking.[10] In addition, Hillard's association with known dealers, his enormous cash expenditures without any apparent legitimate income, falsified lease applications, use of several different cars and apartments, and receipt of collect calls at all hours from suspected heroin dealers all provide at least circumstantial evidence of a narcotics operation. Thus, as Judge Lasker found, the affidavit in its totality contained sufficient information to establish probable cause. As a result, the federal affidavits, which subsume all the information in the New Jersey application and contain additional information as well, must also be considered sufficient to support the later federal wiretap orders. Thus, we believe Judge Lasker properly denied defendants' motion to suppress the evidence derived from the state and federal wiretaps.

## III. *Juror Misconduct*

Appellant James Hillard also contends that an evidentiary hearing should have been held to determine the extent to which jurors had access to extra-record information. One juror told the others during deliberations that one of defendants' lawyers was formerly a prosecutor, that some of the defendants were brought to court in handcuffs, and that defendants' attorneys had been involved in a similar case in the recent past. The forelady of the jury informed the court that these revelations were causing an unspecified "problem" in the jury's deliberations. After interviewing the forelady, the garrulous juror, and one other juror who had impressed the district court "as being very steady and sensible," Judge Lasker determined that a cautionary instruction would be "sufficient to dispel any confusion and alleviate any prejudice" caused by the one juror's improper behavior. The judge then convened the jury and carefully instructed them to disregard any information related to the background of the defendants' attorneys and the custodial status of the various defendants. Several days later, however, it was learned that the problem juror might have heard extra-record conversations to the effect that defendants' Black Sunday heroin operation did exist and was still in operation. The district judge decided not to interrupt the deliberations with a further inquiry. Subsequently, after considering the submissions of the parties on defendants' motion for a mistrial, the court determined that a further inquiry was not warranted, and denied defendants' motion.

◼ Appellant contends that the initial extra-record information regarding the lawyers and the custodial status of the defendants was prejudicial and so disrupted the jury's deliberations as to render the jury unable to reach an impartial verdict. Appellant argues further that the extra-record information regarding the existence and operation of Black Sunday tended to support "a hotly contested element of the government's proof." At the least, defendant claims, the district court should have

---

**10.** We cannot say that Judge Lasker erred in holding that these two transactions were not too lacking in corroborative detail and too stale to support a finding of probable cause. Although the details of the 1981 sale are not provided in the affidavit, the informant did indicate to investigators ahead of time that he could make a purchase from James Hillard, and after the alleged sale the informant did turn over several envelopes of heroin. With regard to the 1980 sale, government investigators observed much of the transaction themselves. Moreover, since the warrant application indicates a continuing involvement in heroin transactions, the lapse of time between the two transactions at issue becomes less significant. *United States v. Beltempo*, 675 F.2d 472, 477 (2d Cir.1982), cert. denied, —— U.S. ——, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1983); *Mapp v. Warden*, 531 F.2d 1167, 1172 (2d Cir.), cert. denied, 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976). Under the circumstances, we think both transactions supported a finding of probable cause.

conducted an evidentiary hearing to determine the extent to which defendants may have been prejudiced. We agree with the district court, however, that further inquiry was unnecessary, and that defendants were not prejudiced.

■ We note first that the trial court has wide discretion in deciding how to pursue an inquiry into the effects of extra-record information. See *Marshall v. United States*, 360 U.S. 310, 312, 79 S.Ct. 1171, 1172, 3 L.Ed.2d 1250 (1959). The court below carefully interviewed three jurors, on the record and in the presence of counsel, before reaching the determination that a cautionary instruction would be an adequate response. This court has found similar inquiries coupled with cautionary instructions adequate to cure this kind of possible prejudice in the past. See, e.g., *Sher v. Stoughton*, 666 F.2d 791, 794–95 (2d Cir.1981); cf. *United States v. Lord*, 565 F.2d 831, 837–39 (2d Cir.1977). After reviewing the record, we cannot say that more was required in this case.

■ We recognize that extra-record information that comes to the attention of a juror is "presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). But the presumption may be rebutted by a showing that the information is harmless. Id.; *Sher v. Stoughton*, supra, 666 F.2d at 793. As this court stated in *United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir.1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971):

> The touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter, ... but the nature of what had been infiltrated and the probability of prejudice.

As Judge Lasker noted, it is hard to see how appellant might have been prejudiced by the jurors' learning that one defense lawyer was formerly a prosecutor. Moreover, it seems probable that the average juror would realize that a defendant is likely to engage the services of a lawyer who has handled similar cases in the past. It is possible that an uninformed juror might draw improper inferences from the fact that certain defendants were brought to court in handcuffs, but this court has held in the past that such possible prejudice can be cured by a prompt inquiry and a curative instruction. See, e.g., *United States v. Taylor*, 562 F.2d 1345, 1359–60 (2d Cir.), cert. denied, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977).

Of somewhat greater concern is the infiltration of extra-record information concerning the existence of the Black Sunday heroin ring. Proof of the existence of the ring was critical to the government's case. But as this court indicated in *Sher,* such information may be only "cumulative" and non-prejudicial if it concerns a matter as to which there is abundant properly admitted evidence. *Sher v. Stoughton*, 666 F.2d at 793–94. We think that is the case here. Indeed, on summation defense counsel conceded that "there is overwhelming evidence of a narcotics conspiracy...." Under these circumstances, we cannot say that the District Court abused its discretion in refusing to hold an evidentiary hearing and denying defendants' motion for a mistrial.

We have considered all of appellants' arguments, and find that they do not justify reversal of the decision below. Accordingly, we affirm the decision of the district court in all respects.