**UNITED STATES of America,**

v.

**Solomon WEISS, Defendant.**

**No. 81 Cr. 636 (MJL).**

United States District Court,
S.D. New York.

Dec. 22, 1983.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. by Nathaniel H. Akerman, Asst. U.S. Atty., New York City, for United States.

Robert Kasanof and Bart M. Schwartz by Robert Kasanof, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

Presently pending before this Court are two separate post trial proceedings brought by the defendant, Solomon Weiss. The most recent is defendant's motion for a new trial on the ground of jury contamina-

tion pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Also pending before this Court are previously filed motions for judgment of acquittal pursuant to Rule 29, or in the alternative, for a new trial under Rule 33, alleging *inter alia* that the credible evidence is insufficient to support a verdict of guilty on any count.

Two separate discussions follow. The Rule 29 and the Rule 33 opinion was written in May, 1983, but was not released, because of a letter received by this Court from defendant's attorney, Robert Kasanof, dated May 12, 1983 (see footnote 2 *infra*). It was the opinion of this Court upon receipt of the May 12, 1983, letter, that the issue of jury contamination should be resolved prior to final determination of the earlier Rule 29 and 33 motions.

## I. BACKGROUND

The multiple count indictment filed in this case charged the defendant with racketeering, mail fraud, perjury and tax fraud. The theory of the government's case at trial was that in 1973, Weiss arranged for Warner Communications ("Warner") to purchase stock in the Westchester Premier Theatre ("WPT") and in return, receive cash for a Warner "cash fund". As part of the scheme, the government argued that Weiss caused Warner to issue checks for services never actually performed by others for Warner in order to obtain money for Warner's "cash fund." The defendant denied the charges contained in the indictment.

At the conclusion of a three week trial, the jury commenced its deliberations on Tuesday afternoon, November 23, 1982, at approximately 1:45 p.m. (Tr. 1937)[1] The jury deliberated for several hours that first day, retiring for the evening at 10:00 p.m.

(Tr. 1952) Deliberations resumed at 10:00 a.m. the following morning, Thanksgiving eve, and continued until 5:50 p.m. (Tr. 1954, 1980)

At the end of the second day of deliberations, at 5:50 p.m., the jury informed the Court that it was unable to reach a unanimous verdict on any count. (Tr. 1980, Court Exh. X) The defendant then moved for a mistrial. (Tr. 1980) That motion was denied. (Tr. 1984) The Court instead instructed the jury, to resume deliberations. (Tr. 1989–1990) Twenty minutes later, the jury requested that its deliberations be adjourned until after the Thanksgiving holiday. (Tr. 1992) Following the Thanksgiving recess the jurors resumed deliberations on Friday morning, November 26, 1982. (Tr. 1994) On Saturday, November 27, 1982, at 4:00 p.m., the jury returned a verdict of guilty on seven of the thirteen counts charged in the indictment. (Tr. 2056) These seven counts charged Weiss with RICO violations, mail fraud, and perjury.

On December 12, 1982, defendant submitted motions under Rule 29 or, in the alternative requested a new trial under Rule 33. After extended briefing by the defendant and the government, the Court held a hearing on the motion on February 23, 1983, and permitted parties to file further written submissions. Final submissions were filed on March 10, 1983.

In May of 1983, the Court was prepared to render a decision on the Rule 29 and 33 motions. However, on May 12, 1983, the Court received a letter from counsel for the defendant requesting that the court hold in abeyance its pending decision since the defendant had a new and urgent matter, the possibility of jury contamination, to bring before the Court.[2]

---

**1.** Throughout this opinion the trial transcript will be referred to as "Tr." followed by the appropriate page number. The government exhibits will be designated "GX" and the defendant's exhibits will be designated "DX".

**2.** The letter of May 12, 1983 states:

"May 12, 1983

BY HAND
Honorable Mary Johnson Lowe
United States District Judge

United States District Court for the Southern District of New York
United States Courthouse
Foley Square
New York, New York 10007
*United States v. Solomon Weiss* 81 Cr. 0636 (MJL) (S.D.N.Y.)
Dear Judge Lowe:
  I am writing to request a meeting at Your Honor's convenience on Thursday, May 19th so that we may present to the Court matters

The Court scheduled a hearing on this claim on May 17, 1983, at which time defense counsel requested and the Court granted an *in camera* hearing on the allegations. Present at the May 17th hearing were Assistant United States Attorneys Nathaniel Akerman and Lawrence Pedowitz representing the government, and Robert Kasanof and Bart Schwartz then of the law firm Kasanof and Schwartz representing the defendant. Also present was Leon Silverman, who is of counsel to Kasanof and Schwartz.

Mr. Kasanof informed the Court that extra-record evidence had been presented to the jury during their deliberations which may well have contaminated those deliberations. Mr. Kasanof then read from the trial transcript of November 26, 1982 (page 1998, lines 13 to 20), which was a proceeding after the court had received a note from the deliberating jury (Court Exh. Y). The transcript was as follows:

> THE COURT: [Reading the note from the jury] The jury has been directed to use its best unbiased judgment and common sense in reaching a verdict on a series of counts outlined to us. Our ability to do this fairly is dependent upon our varied, collective experiences. Most of us are unfamiliar with the nature of the training of a CPA. Underlined. "Mr. Weiss is a CPA."
> Question, period, for question: Is this jury entitled to know what a CPA is, as opposed to bookkeeper, lawyer versus legal aid[e], M.D. versus paramedic, dentist versus dental tech."
> A line is drawn and under the line is: "Re underlined (Xerox), sentences, Meigs and Meigs. ["]
> "_____, J3," and signed by our foreperson.

which we believe are of major importance and may impact motions which Your Honor now has under consideration but are directed at matters which have just come to light and which have not yet been brought to the Court's attention.
We ask for May 19th so that we may be fully prepared to make a presentation to Your Honor and so that Mr. Weiss' appellate counsel, Mr. Leon Silverman, will be able to be present.

Mr. Kasanof informed the Court that he had identified a standard set of accounting textbooks which were authored by *Meigs* and *Meigs,* and which also discuss the "understanding or required understanding of a CPA..." [3] Mr. Silverman reported to the Court that he had been reliably informed by someone that an accounting text had been brought into the jury room during deliberations. This person indicated to Mr. Silverman that a magazine reporter had interviewed several jurors in the case who in the course of the interviews stated that "a text, an accounting text had been brought into the jury room." (Hr. I, 7) On a later occasion, Mr. Silverman continued, he spoke with the same reporter who stated that his research indicated that, although the textbook had not been brought into the jury room, a copy or excerpt from the book was present during the deliberations. (Hr. I, 8)

Mr. Kasanof then marked the textbook *Meigs & Meigs, Financial Accounting,* as an exhibit and read into the record the following from page 6. (Hr. I, 11–12)

> Certified public accountants are independent professional persons comparable to attorneys or physicians who offer accounting services to clients for a fee ... The principal function of a CPA is auditing. How do people outside a business entity, owners, creditors, government officials and other interested parties know that the financial statements prepared by the company's management are reliable and complete? In large part these outsiders rely upon audits performed by a CPA firm which is independent of the company issuing the financial statements.

> We represent to the Court that the matters we seek to raise are of sufficient importance and sensitivity as to make a conference with the Court necessary and appropriate.
> Respectfully submitted,
> Robert Kasanof
> cc: Nathaniel Ackerman, Esquire (By Hand)
> Leon Silverman, Esquire."

**3.** Transcript of May 17, 1983, hearing (Hr. I at 5–6).

Defense counsel stated that the jurors either had the excerpt from the book or it was read to them for the purpose of indicating that a CPA had a greater degree of responsibility and learning than a bookkeeper.

Mr. Kasanof then submitted a list of cases and made a motion that the Court inquire of the jurors concerning the alleged extra-record evidence. After a short recess and further discussion, the Court granted the government's request to adjourn the proceeding for briefing and set the matter down for May 20, 1983, for a decision on defense counsel's application. On application of Mr. Kasanof and with no objection from the government, the record was sealed. At the May 20, hearing the Court ruled that an inquiry of all the members of the jury would be conducted beginning on May 25, 1983, and also at that time, a conference would be held for both sides to work out the mechanics of the questioning.

At the inquiry, the Court questioned Juror # 3, the author of the jury note, Court Exh. "Y", who stated that when he came to the deliberations on November 26, he brought with him a basic text on bookkeeping and had xeroxed a page of the book.[4] Juror # 3 explained that neither the book nor xerox was brought into the jury room. (Hr. II, 27) However, Juror # 3 testified that from his reading of the book, he explained to the jury what kind of training an accountant has, and specifically, how such training differs from the training of a bookkeeper. (Hr. II, 27–28) When asked by the Court to explain his reasons for what he did, Juror # 3 stated that:

One of the key aspects of deciding whether or not Mr. Weiss was guilty rested on the argument of whether or not one can reasonably expect him to know certain kinds of things. The understanding that Mr. Kasanof would have had us to accept was that ... (Mr. Weiss) was just following the kinds of things that a bookkeeper or accountant does without really having a good grasp

of the significance of it.... And if the man was functioning as a bookkeeper then one might accept that, I suppose. But ... to me what is important, to me the man is trained as a CPA... [Hr. II, 32–33]

Juror # 3 further testified that:

When you have a CPA (in contrast to a bookkeeper) you're (sic) trained different ... I felt that was important for people to understand that because we're trying to decide what Mr. Weiss knows and what it is that we can reasonably expect him to know and what you can reasonably expect of him is different for a CPA than it is for a bookkeeper. [Hr. II, 28]

In response to the Court's written inquiry to Juror # 3 [5] asking him to indicate those portions of the text that he explained to the jury, he responded with the following letter to the Court:

"Your Honor:

At some point during the trial the nature of the defendants education was discussed. It was indicated that Mr. Weiss was a CPA. Neither lawyer disagreed with this. CPA—this is not 3 randomly selected letters, it is not XYZ. CPA abbreviates CERTIFIED PUBLIC ACCOUNTANT. Certified by who to do what? What is his job? For what may he be held accountable as a CPA? A lawyer can be disbarred, a medical doctor can have his license revoked. What can happen to a CPA?

I have bracketed the quote I recited to the jury on page 7. My note which you asked if I had written, may also have mentioned another page but I believe I didn't bother with it. For my own edification I read pages 6, 7, 8 and perhaps a few other pages at home—not at the court house.

We were to use our best judgement, experience, etc. in evaluating the evidence presented. No one said I could not inform myself of the training and skills of a CPA. Having done so, that is my experience. The quote is a definition. It

4. Court's Voir Dire on May 25, 1983 (Hr. II) page 26.

5. See letter from Court dated June 3, 1983.

is in no way directed toward either the prosecution or the defense. Since I could not get the page entered in a formal way, it was presented as my opinion— carrying no more weight than anyone else's opinion. The argument among jurors was going on before the quote, and contiued (sic) to the end of the deliberations. The other jurors were not willing to let me rephrase the question so I dropped the issue and left it as my own opinion.

Respectfully," [6]

In addition to the testimony of Juror # 3, at least six other jurors of the twelve were interviewed by the Court, seven had some recollection of the note in question (Exhibit "Y").[7] The knowledge of these six ranged from a simple recollection that the note was written, to a specific recollection of the conversations that lead up to and followed the writing of the note. On June 1, 1983, the Court questioned the marshall who was assigned to the jury deliberations on November 26, a Mr. Richard McHale. Marshall McHale testified that he neither recalled seeing an accounting book in the jury-room, nor recalled any juror asking that he give to the Court a book or xeroxed pages of a book.[8] On June 29, 1983, following several hearings on this matter, defense counsel filed a motion for a new trial pursuant to Rule 33, on the ground of jury contamination. On July 7, 1983, the government filed its opposition to the latest motion, and final submissions were made on July 14, 1983. Given the sensitive nature of the proceedings and at the request of counsel all of the records pertaining to the jury inquiry were sealed.

## II.  EVIDENCE PRESENTED AT TRIAL

Because the jury contamination question requires this Court to look at the entire trial record, (see legal discussion pages 1236–1237 *infra*), what follows is a detailed examination of the evidence presented at trial. The record before the Court is both lengthy and complicated. For purposes of clarity and organization this opinion relies on both parties' summations in its review of the record.

In his summation Assistant United States Attorney Nathaniel H. Akerman (AUSA Akerman) stressed three factors which he claimed proved Weiss' guilt: (1) the direct testimony of accomplices, (2) the undisputed evidence of his signature on the documents in question, and (3) evidence suggesting that Weiss committed forgery.

### I.  Testimony of Horwitz and Emmett (The Accomplices)

As defendant's counsel stated in his summation, the question before the jury was a "relatively sharply drawn issue" (Tr. 2050) as to whether the jury believed the government's witnesses, Jay Emmett and Leonard Horwitz, or the defendant. The testimony of Emmett and Horwitz, the government argued, proved that Weiss negotiated with Horwitz for cash, accepted cash from Horwitz, made false entries in Warner's records and caused false documents to be created knowing that it was for a secret cash fund.

Horwitz testified that sometime in May 1973, the Westchester Premier Theater ("WPT") was in the process of selling stock for a public offering. (Tr. 130) During the course of this offering, Elliot Weisman, the president of WPT, asked Horwitz, a friend of Emmett to approach Emmett about purchasing 10,000 shares of WPT stock for $75,000. (Tr. 138) Under the deal offered by Weisman, the theater would loan Emmett $50,000 toward the purchase price of the stock. (Tr. 138)

Horwitz subsequently met with Emmett at the Warner office and carried with him, in a brown paper bag $50,000 received from Weisman. (Tr. 140) Emmett testified that after hearing Horwitz' proposal, he declined his offer because he had already bought 10,000 shares of seed stock in the

---

6.  See letter from Juror # 3 dated June 2, 1983.

7.  The six jurors were juror numbers 2, 5, 8, 9, 11 and 12.

8.  Hearing of June 1, 1983 pages 7 and 8.

WPT for a lower price and did not wish to buy any more. (Tr. 680) He suggested, however, that Warner might be interested in the offer. (Tr. 681) Emmett left Horwitz to go talk to Steven Ross, Chairman of the Board of Warner. (Tr. 681) According to Emmett's testimony, Ross stated that Warner could not take a loan to buy stock in a public company, but suggested that Horwitz meet with Sol Weiss,[9] and that maybe Horwitz could help with the Warner "cash fund". (Tr. 681) Emmett then contacted Weiss and told him of his conversation with Ross. (Tr. 682) Thereafter, Emmett introduced Weiss to Horwitz and left the two to discuss the matter. (Tr. 682)

Horwitz testified that he proposed to Weiss the same deal that he had offered to Emmett. (Tr. 143) Weiss indicated that the company would be interested since it always had a need for cash. (Tr. 143) Weiss then counted the cash in the paper bag, excused himself and started to leave the room. (Tr. 144) Horwitz asked Weiss if he was going to see Ross and Weiss responded that Ross' name wasn't to be used. (Tr. 144) Five to ten minutes later, Weiss returned and made a counteroffer. He proposed that Warner would buy 20,000 shares of stock, provided that WPT give Warner $100,000 in cash as payment for Warner buying the stock. (Tr. 144) Horwitz phoned Weisman, secured his approval, and accepted Weiss' offer. (Tr. 145) The $50,000 in cash in the bag was then turned over to Weiss with the promise that the additional $50,000 would be forthcoming. (Tr. 146)

II. *Undisputed evidence of Weiss' signature on the documents in question.*

On May 30, 1973, Warner purchased 20,000 shares of WPT stock. The request for check[10] was prepared and initialed by Weiss. (GX 1) The request for check was also approved by Bert Wasserman[11] and

contained the writing "O.K. per Jay Emmett". Pursuant to this request, a check was mailed to the brokerage firm handling the transaction. (GX 2) Horwitz testified that following the stock purchase, Weiss asked Horwitz for the $50,000 in cash that was still due Warner pursuant to their agreement. (Tr. 150) Horwitz informed Weiss that WPT did not have that amount of money in cash, and Weiss modified his original deal with Horwitz. Instead of $50,000 in cash, Weiss instructed Horwitz to deliver to him $20,000.[12] (Tr. 151) At the same time Weiss agreed to issue two Warner checks totalling $50,000 to WPT representatives for non-existent services. (Tr. 151)

Horwitz testified that on the same day that he delivered the $20,000 in cash to Weiss, Weiss in return gave him two checks; one for $30,000 made payable to the WPT and the second for $20,000 made payable to Horwitz. (Tr. 153) Both checks were signed by Jay Hardy, an employee of Warner. (GX 8 and 15) Horwitz took the $20,000 check and opened an account at Bank Leumi. (Tr. 154, GX 10 is the record of that account) After depositing that check, Horwitz withdrew $9,900 to give to Elliot Weisman. (Tr. 153, GX 12 is a check for cash in the amount of $9,900) Horwitz delivered to Weisman the $30,000 check made out to the WPT. (Tr. 156) However, Weisman would not accept the check since it was made out to WPT and would therefore be accountable on its books and records. (Tr. 157) Horwitz returned this check to Weiss, who then voided it by tearing off the signature. (Tr. 157, GX 17) Horwitz and Weiss agreed that a $30,000 check payable to Dennis Konner of Konner & Brodsky would be issued to replace the original check to the WPT. (Tr. 158)

---

**9.** Defendant Weiss was at that time an officer of Warner with the title of Assistant Treasurer. (Tr. 1454)

**10.** A "request for check" is a standard corporate form which must be furnished with an approval signature on it before a check is issued.

**11.** Wasserman was at that time a vice president and comptroller of Warner. (Tr. 1314–1315)

**12.** Horwitz testified that he obtained this $20,000 in cash from Norman Brodsky, a member of the law firm Konner & Brodsky. (Tr. 152) GX 19 shows that on July 3, 1973, the account of the law firm was overdrawn by $24,231.90.

Horwitz further testified that to make it appear that actual services had been provided to Warner by Konner, Weiss directed him (Horwitz) to prepare a false backdated invoice purportedly from Konner. (Tr. 159–161) As Weiss' July 5, 1983 letter to Horwitz stated:

"Dear Len:

I am still awaiting a bill from Dennis Konner, Esq. for the services rendered up to date. I do not want to hold him up any longer now that Jay has agreed to the fee.

Very truly yours,
Solomon M. Weiss" [GX. 39]

On July 26, 1973, Weiss prepared a request for check payable to Konner for fees re: cable consultation. (GX. 43) On that same day a check for $30,000 was made out to Konner from Warner and signed by Weiss. (GX. 44)

On October 23, 1973, Weiss wrote another letter to Horwitz:

"Dear Len:

As a reminder, I have not received the bill for the legal services that you indicated you would get for me.

Very truly yours,
Solomon M. Weiss" [GX. 48]

III. *Evidence relevant to the forgery and perjury charges*

Horwitz testified that after he received the October 23, 1973, letter, he prepared the Konner bill for non-existent legal services. (Tr. 162, GX 49) Since the Warner check to Konner for $30,000 was dated July 26, 1973, and the second letter to Horwitz regarding a bill for legal services was dated October 23, 1973, Horwitz at Weiss' request, back-dated the Konner bill to July 11, 1973, so that it would appear as though this bill had been submitted on a timely basis. (Tr. 163)

In addition, the Konner bill bears the signature "J. Emmett", AUSA Akerman argued in his summation that the signature

was forged by Weiss. At trial the government offered the testimony of handwriting expert Ms. Pearl Tytell. Ms. Tytell identified the signature on the Konner bill as a signature written by Weiss. (Tr. 463) She testified that there were enough characteristics in the writing of "J. Emmett" on the bill to match the characteristics in the handwriting of Weiss for her to form an expert opinion. (Tr. 465–7) [13] AUSA Akerman argued in summation that the signature looked like Weiss' handwriting, that Weiss was the only person who wrote the name "J. Emmett" without spelling out J–A–Y, and that all of the handwriting experts who testified in the case agreed that the signature which appears on the bill is not the signature of Jay Emmett. (Tr. 1678)

At trial, Weiss testified that he wrote the letter of October 23, before he realized that the company had received the Konner bill and that in the interim, Emmett had instructed him to issue the $30,000 Konner check. (Tr. 1462, 1464) Weiss explained that he wrote both the letters to Horwitz because he was instructed by Emmett to obtain the bill for legal services owed to Konner for work on the Television Communication Company ("TVC") acquisition by Warner. (Tr. 1460)

This explanation by Weiss is contrary to his grand jury testimony on April 10, 1978. Weiss testified before the grand jury that he prepared the July 26, 1973, check request from the July 11, 1973 Konner bill.[14] In addition, Weiss denied to the grand jury that there was any connection between Horwitz and the bill from Konner.[15] AUSA Akerman on summation, explained these discrepancies arguing that when Weiss testified before the grand jury on April 10, 1978, he had no reason to believe that Horwitz, who was then an employee of Warner, would turn over to the government the letters dated July 5, 1973 and October 23, 1973. (Tr. 1681–1682)

---

**13.** Furthermore, handwriting experts for the defense acknowledged that although there were not enough characteristics in this particular exhibit to identify it as Weiss' handwriting, Weiss could have written the signature.

**14.** Grand jury minutes April 10, 1978, page 18.

**15.** Grand jury minutes, April 10, 1978, page 31.

## IV. *The Second Stock Purchase*

Shortly after the close of the public offering of WPT stock, Horwitz testified that he entered into a second transaction with Weiss, for Warner to buy an additional lot of WPT stock. (Tr. 167) Warner was to purchase $100,000 worth of WPT stock and in exchange receive $100,000 in cash when the theater opened in March of 1974. (Tr. 167–68) The $100,000 that WPT was to pay to Warner was to come from the sale of theater tickets. The government offered GX 40 and its attachments as evidence that Weiss approved this purchase.[16] (Tr. 1550–1551) The letter which transmits the check for the purchase of this stock, lists five names on the lower column indicating those persons who received blind copies of the letter. (GX 40) Weiss' name heads the list.

On summation, AUSA Akerman contended that Weiss' name was the only one on the list that did not make sense in the normal course of Warner business. (Tr. 1686) Weiss was in charge of the personal finances of Warner's top executives. (Tr. 1454) It was therefore unusual for Weiss to be involved in any purchase of stock for Warner's stock portfolio. It was rather, Bert Wasserman, who had this corporate responsibility. (Tr. 1315) In addition, not once prior to and not once since that occasion did Weiss' name ever appear on any documents for stock purchases. (Tr. 1687)

Horwitz testified that in late 1973 it became apparent the WPT would open at a much later date than previously planned and as a result, the understanding for the second stock purchase was altered. (Tr. 170–173) Weiss agreed to issue Warner checks to the WPT for $150,000, and the theater in exchange would return to Warner $100,000 of the proceeds of the checks. (Tr. 173–176) Pursuant to this new agreement, Weiss wrote the following memo to Mr. Hardy of the accounting department: "It is most likely that we will be signing a cable option with the WPT in the month of

November and we will need $150,000 or some part of that. I cannot tell for certain when, but probably the 3rd week of November." [GX 50] It was ultimately decided that Warner would issue the checks to Horwitz and Bruce Kosman ("Kosman")[17] and Horwitz in return, would deliver the cash to Weiss. (Tr. 173–176)

## V. *Evidence of The Transactions*

Horwitz testified that before either Kosman or Horwitz received any Warner checks in relation to the second stock purchase, he (Horwitz) gave Weiss the name Albert Bzura, as a name to use in the scheme. (Tr. 174) On December 27, 1973, a check for $40,000 was made payable to Bzura from Warner. (GX. 51) This check was cancelled because Bzura was unwilling to deliver the cash to Weiss prior to receiving the check. (Tr. 175) On January 10, 1974, Weiss wrote an interoffice memorandum asking that the $40,000 check be cancelled. (GX. 53)

Horwitz testified that pursuant to Warner's second stock purchase, between 1974 and 1977, Weiss arranged for Warner to issue ten checks to Horwitz and Kosman. (Tr. 175) There was no legitimate work done for any of these checks. (Tr. 175) Horwitz stated that he delivered $100,000 in cash to Weiss at Warner in exchange for the checks. (Tr. 175–176) Horwitz testified that the established pattern of operation for this scheme was for Horwitz to first deliver the cash to Weiss and then receive the checks from Warner. The evidence of each of these transactions was as follows:

(1) On January 14, 1974, a request for check was prepared by Weiss for payment of $30,000 to Kosman for consulting fees re: Jungle Habitat. (GX 55) Pursuant to this request, a check was issued to Kosman on January 16, 1974. (GX. 58)

---

16. On each of the four stock confirmations attached to the exhibit is found "O.K." and the initials of Solomon Weiss.

17. Kosman was brought into the scheme because of his favorable tax situation, i.e. a carryover loss that he had which would permit him to take a tax deduction for these particular checks. (Tr. 173–74).

(2) On January 14, 1974, a request for check was prepared by Weiss for payment of $10,000 to Horwitz for consulting fees re: Jungle Habitat. (GX. 62) [18] Pursuant to this request a check was issued on January 16, 1974, to Horwitz. (GX. 63)

In support of Horwitz' testimony the government offered into evidence Weiss' desk calendar that indicated that Weiss had met with Horwitz on January 15, 1974, at 9:30 in his office. (GX 55A) In addition, documentary proof was offered that on January 15th and 16th he and his cousin Seymour Niesen obtained through two bank loans for $20,000 in cash.[19] (Tr. 182–186) Horwitz testified he later delivered this $20,000 in cash to Weiss.

To complete the transaction, on January 18, 1974, Horwitz received $20,700 from Kosman.[20] Horwitz stated that he took $15,700 of that amount along with Horwitz's own personal check in the amount of $5,000,[21] to reimburse his cousin, Niesen the $20,000 plus he gave Niesen $700 for his help.

On summation AUSA Akerman asked the jury to consider notations on the remittance advices [22] for Warner's January 16, 1974 checks to Kosman and Horwitz. From these remittance advices it appears that on February 11, 1974, there was written "Sol ? Al" on the form. Mr. Albert Sarnoff, treasurer of Warner, questioned Weiss about the propriety of the checks for $40,000 since the documentation for the two checks only bore Weiss' approval, and Weiss' handwriting indicated that these checks were related to real estate consulting fees. (GX 54, 55, 62) Weiss apparently gave Mr. Sarnoff a satisfactory answer. (Tr. 1564–5) AUSA Akerman explained that Mr. Sarnoff, as head of real estate for Warner, had a good reason for questioning Weiss about these checks. (Tr. 1694) After this questioning, AUSA Akerman argued, Weiss was careful in the future and had other Warner officials approve these payments for non-existent services, to insure that no further questions were asked by Mr. Sarnoff or anyone else. (Tr. 1694)

(3) On March 28, 1974, Weiss prepared another check request for Horwitz in the amount of $10,000 as payment for a consulting fee. It was approved by Caesar Kemmel, an executive of Warner. (GX. 72) The check request had instructions written on it directing that the check was to be drawn on April 1, 1974. Horwitz testified that before he received this check he delivered $5,000 in cash to Weiss. (Tr. 192)

(4) On January 14, 1975, Horwitz and Niesen again went to a bank where Niesen borrowed $15,000. (GX. 77) Sometime between January 15th and 17th, Horwitz testified he delivered this $15,000 in cash to Weiss. (Tr. 198) In return: on January 15, 1975, Weiss prepared a request for check in the amount of $25,000 to Horwitz for consulting fees. (GX 78) The request indicated that it was "approved" by "J.E." the request also stated that the prepared check was to be delivered to Weiss. A check was made out to Horwitz on January 15, 1975. (GX. 79) Horwitz stated that he took this check, and deposited it into his bank account. (Tr. 199 GX. 83) Then using a number of personal checks, Horwitz repaid his cousin the $15,000 he had borrowed. (Tr. 199–200 GX 83–87)

Horwitz testified that in 1976, Weiss asked him to prepare a feasibility study as a coverup for subsequent checks. (Tr. 224–225) Pursuant to this arrangement, Weiss sent Kosman a copy of reports on a feasibility study which already had been prepared for Warner by Zorn Industries.[23] Horwitz, Weiss and Kosman then visited the site of the subject of these reports, Jungle Habitat, in order to give further

---

**18.** The request for checks indicated that the checks to Kosman and Horwitz were to replace the cancelled check to Bzura.

**19.** See, GX 56, 57.

**20.** GX. 69 is a check for cash in that amount drawn against Kosman's account.

**21.** Tr. 189 GX. 67 is Horwitz's check to Niesen for $5,000.

**22.** A remittance advice is the corporate file copy of an issued corporate check.

**23.** GX. 88, 89, 90 are cover letters signed by Weiss which accompany the materials for the reports.

credence to the study. (Tr. 230) Documents from Warner's files disclosed that Kosman presented to Warner an almost identical copy of the original Zorn report representing that it was his original work. (GX 129, 130A–130J)

(5) On August 20, 1976, a bill for $7,682.50 from Kosman was submitted to Warner and was approved by Emmett. (GX. 91) Horwitz testified that on August 20, 1976, he delivered to Weiss $5,000 in cash which he had received from Kosman. (Tr. 233) [24] In connection with this transaction: a check from Warner to the Kosman Agency in the amount of $7,682.50 was issued on August 19, 1976. (GX 93) Weiss' name is nowhere on the check. The back of the check shows that it was cashed on August 24, 1976. (GX. 96) [25]

(6) On September 1, 1976, another bill from the Kosman agency was mailed to Warner and was approved by Emmett. (GX. 100) This bill was for the amount of $15,344.20. On September 8, 1976, Kosman cashed a check for $9,500 to give to Horwitz. (GX. 101) Horwitz testified that Kosman gave him another $500 totalling $10,000 which he delivered to Weiss. (Tr. 237–38) Pursuant to the bill for $15,-344.20, a check from Warner payable to Kosman Agency dated September 7, 1976 was drawn in the amount of $15,344.20. (GX 102) Weiss' signature does not appear on the face of this check.

(7) On October 4, 1976, another Kosman Agency bill was submitted and approved by Emmett. (GX. 106) The amount of the bill was $15,342.60. A check was made payable to Kosman in the amount of this bill and dated October 7, 1976. (GX 107) Weiss' name does not appear on the check.

(8) A bill from Kosman for $15,294.40 was received by Warner and dated January 3, 1977. (GX. 110) Pursuant to this bill Warner issued a check payable to Kosman in the amount of the bill and dated January 7, 1977. (GX. 111) Weiss' name does not appear on the check.

(9) Warner was billed $23,287.00 by Kosman on February 23, 1977, and on the face of the bill is Emmett's written approval. (GX. 114) Warner issued on February 25, 1977, a check payable to Kosman for $23,-287.00. This check was signed by two persons, neither of which was Weiss. (GX. 115) Horwitz testified that he received the check in transaction # 9 before he delivered the cash ($15,000) to Weiss. (Tr. 260)

(10) From June 3rd to June 10th, 1977, Horwitz through various means, gathered $10,000 in cash which he testified that he delivered to Weiss. (Tr. 266, GX 118, 119, 120) On June 9, 1977, Weiss prepared another request for check to Horwitz in the amount of $20,000. (GX. 121) It contains Emmett's written approval and the notation that it was a payment made in connection with the termination of the Jungle Habitat survey conducted by Horwitz. A check from Warner for the amount of the bill was made payable to Horwitz and dated June 10, 1977. (GX 122) Horwitz testified that after he deposited this check into his account, he reimbursed Niesen for at least $3,000.00 of the money that he borrowed from him in order to deliver the $10,000 cash payment to Weiss. (Tr. 270)

VI. *Evidence Presented By The Defense*

In response to the government's case, Weiss' defense stressed the implausibility of the government's theory, the inconsistent testimony and bias of the government's witnesses, and the credibility of Weiss' testimony.

In his summation to the jury, Mr. Kasanof argued that Emmett was the key to this entire case. (Tr. 1766) Emmett testified that in 1979 he plead guilty to stock fraud and the government did not pursue its right to forfeit his stock in Warner. Emmett thereby retained 145,000 shares of Warner stock which were valued at the time of trial at about 7 million dollars. Mr. Kasanof argued that before Emmett falsely testified against Weiss, Emmett negoti-

---

**24.** GX 92 is a personal check drawn against Kosman's account for $5,000 cash.

**25.** GX 99 is a bank photograph of Kosman and Horwitz at the bank where, and on the date when, the check was deposited.

ated a deal with the government. Further, the only thing that Emmett could offer to the government that was worth seven million dollars was a story that would incriminate Weiss, "with an option on Ross." (Tr. 1778)

In addition, Mr. Kasanof argued that Emmett had a strong motive to see that WPT stock was bought by Warner since he already owned a fair amount of seed stock. (Tr. 1731) Mr. Kasanof argued that Emmett, as a man with an admitted high and flamboyant life style, had good and sufficient reasons to want to make money through such a scheme. (Tr. 1766, 1772) Given that Emmett's opportunity and motives to engage in these illegal transactions were so apparent, Mr. Kasanof claimed that Weiss was brought into the scheme unwittingly, so that Emmett could distance himself from the operation. While it might have been possible to believe Emmett's story despite his obvious motives to lie, Mr. Kasanof contended, the testimony of Arthur Liman, a respected lawyer in both the private and public sector, proved that Emmett's testimony implicating Weiss in this scheme lacked credibility.[26]

Mr. Kasanof also stressed Horwitz' motives to lie. Horwitz, Mr. Kasanof argued, as part of his plea bargain, falsely incriminated Weiss in order to receive less jail time for his offenses. (Tr. 1760) In addition, Mr. Kasanof suggested that Horwitz was Emmett's friend of long standing and therefore told a story to the government to substantiate Emmett's statements that incriminated Weiss. (Tr. 1766) An example of Horwitz's false testimony against Weiss, Mr. Kasanof argued, was his testimony that before he received the checks from Weiss dated September 7, 1976, he delivered the cash to Weiss. (Tr. 237–38) It was uncontroverted on the record that Weiss was in California between September 6th–9th, and could not have been available to receive the cash payment from Horwitz.[27] Mr. Kasanof contended that Horwitz' credibility was also undermined by the testimony of Michael Armstrong, a well respected attorney. (Tr. 1399)[28]

At trial, Weiss testified that he was a CPA. (Tr. 1507) In addition he testified as to his educational and employment background and his duties at Warner. That evidence revealed that Weiss, fifty-three years old, graduated from City College of New York in 1950 with a Bachelor of Science degree and later received a masters of business administration degree from Rutgers University. (Tr. 1451) From the early 1950's to 1962 Weiss worked as a public accountant for a public accounting firm. (Tr. 1450–52) In 1962, Weiss was employed by the company which later was known as Warner. Initially, Weiss worked in the company's accounting department, and in 1970 was elevated to Assistant Treasurer and Vice President. Because of ill health he dropped his responsibilities as a Vice President but continued as the Assistant Treasurer. (Tr. 1453–54)

As Assistant Treasurer, Weiss oversaw the personal finances of Warner's top executives including the Chairman of the Board. He conducted tax and financial planning for these executives, proposed investment opportunities for them, advised them in their financial matters and assisted them in preparing their tax returns. Weiss also maintained the books and records of the New York Cosmos, the soccer team owned by Warner. From 1973 to 1977 Weiss' annual compensation from Warner went from $55,000 to $122,791. (Tr. 56, 83–4, 683, 844, 943, 1067, 1068, 1069, 1115–

---

**26.** A collision of oaths between Liman and Emmett resulted when Liman testified that, contrary to Emmett's testimony, he never requested that Emmett loan Horwitz $100,000 so that Horwitz could pay his legal fees. (Tr. 1196–99)

**27.** Weiss produced at trial evidence of airline tickets, expense accounts and car rental bills to prove that he was in California on those dates. (Tr. 1443–49 GX 361, DX R).

**28.** A memorandum prepared by Mr. Armstrong for Warner, after Mr. Armstrong met with Horwitz' lawyer suggested Horwitz' willingness to lie and incriminate others in order to obtain a favorable deal from the government. (Tr. 1399–1400 DX Q.)

6, 1177, 1185, 1282-3, 1321, 1454, 1469, 1505-10, 1517-20, 1526; DX I)

In his own defense, Weiss testified that although he undeniably signed his name to the documents in question, he was unaware of either an illegal scheme to sell WPT stock or a plan to establish a Warner cash fund. (Tr. 1434-1436) As proof of his credibility, Weiss offered the testimony of character witnesses who testified that Weiss enjoyed a reputation for being honest and that they personally believed he was honest. (Tr. 1267, 1310)

At trial Weiss' secretary, Linda Horns, testified that in 1973, Weiss dealt with Horwitz on Warner's investment in the WPT. (Tr. 57) In addition, Ms. Horns stated that during that time Horwitz came by twice a week, and telephoned Weiss four or five times a week. (Tr. 58, 59) Weiss' testimony acknowledged that Ms. Horns' statements were true, but explained that Horwitz frequently visited his office because Horwitz was a constant pest who tried to get financing for various schemes. (Tr. 1486)

On summation Mr. Kasanof contended that if Weiss was guilty of the offenses he was charged with (coordinating a sophisticated scheme to establish a Warner cash fund), he would never have left a written trail that the government could use to tie him to the scheme. (Tr. 1798) Instead, Weiss would have used the telephone to ask Horwitz to send in phony legal services bills.[29] Mr. Kasanof also argued that this same logic should be applied to the evidence of the cancelled Bzura check and the subsequent checks to Kosman and Horwitz that replaced this cancelled check. For Weiss to have clearly indicated on the two checks that they replaced the Bzura check meant, according to Mr. Kasanof, that Weiss felt no need to hide these transactions since he assumed that they were legitimate. (Tr. 1798)

On instructions from the government, Emmett taped a conversation with Weiss.

(GX 206) In this conversation Emmett did not elicit admissions of guilt from Weiss. However, Weiss did not deny any involvement in the scheme, but rather answered Emmett's comments and questions with silence. Mr. Kasanof argued that Weiss' silence on the tape suggested his innocence rather than his guilt. (Tr. 1803) Mr. Kasanof also contradicted the government's assertion that Mr. Sarnoff's questioning of Weiss and Weiss' satisfactory answer proved Weiss' guilt. (Tr. 1728) Rather, Mr. Kasanof maintained that when Weiss was questioned by Mr. Sarnoff about the checks to Kosman and Horwitz, Weiss simply explained the truth as he then understood it, i.e. that these expenses were approved by Emmett.

Weiss denied at trial that he forged Emmett's signature. (Tr. 1459) On summation Mr. Kasanof argued that his client must have been telling the truth when he stated that he did not commit forgery, because if Weiss and Emmett were in these schemes together, Weiss would have no need to forge Emmett's name. (Tr. 1730) All Weiss had to do, Kasanof stated, was to ask Emmett to approve the bills submitted by Horwitz, Konner and Kosman.

There was no doubt that Weiss' testimony before the grand jury in 1978 differed from his testimony at trial on certain matters. However, Mr. Kasanof argued that these discrepancies were easily understood given Weiss' lapse of memory [30] and the different nature of the proceedings. Moreover, Mr. Kasanof contended that if Weiss was a dishonest accomplice he would have made sure to keep his testimony consistent at both proceedings. (Tr. 1801)

### III. LEGAL DISCUSSION

It is a fundamental precept of our criminal justice system that the " 'conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence.' " *Bulger v.*

---

**29.** Weiss admitted that he wrote two letters to Horwitz in 1973, which requested that Weiss be sent a bill for legal services provided to Warner. (Tr. 1459, 1462)

**30.** A memory expert testified that such a memory lapse was not indicative of willful lying. (Tr. 1621)

*McClay,* 575 F.2d 407, 408 (2d Cir.) (Kaufman, J.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978) *quoting Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907). That principle is grounded in the defendant's rights of confrontation and cross-examination, which are fundamental requirements of a constitutionally fair trial. *Parker v. Gladden,* 385 U.S. 363, 365, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966).

■ Because of the importance of these rights, the Second Circuit has recognized that "extra-record information that comes to the attention of a juror is 'presumptively prejudicial.'" *United States v. Hillard,* 701 F.2d 1052, 1064 (2d Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983) *citing Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). However, the presumption may be rebutted by an affirmative showing on the part of the government that the information is harmless. *United States v. Hillard, supra,* at 1064. As the Second Circuit stated in *United States ex rel. Owen v. McMann,* 435 F.2d 813, 818 (2d Cir.1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971): "The touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter, ... but the nature of what has been infiltrated and the probability of prejudice."

■ In assessing the "probability of prejudice", the Court must look to the entire trial record; "[s]uch an analysis requires a careful examination of the substance of [the extrinsic evidence] ... and of the other information of which the jurors were properly aware." *Sher v. Stoughton,* 666 F.2d 791, 794 (2d Cir.1981). If the Court finds that there is "abundant properly admitted evidence" concerning the matter to which the extra-record information is relevant, the Court may properly conclude that the infiltration of such information was non-prejudicial. *United States v. Hillard, supra,* at 1064; *Sher v. Stoughton, supra,* at 793–94.

In support of his motion, the defendant argues that he suffered severe actual prejudice as a result of the jury having extra-record evidence. Defendant emphasizes that the jury was obviously troubled by the matters which it was charged to consider. He contends that the jurors felt constrained to turn to the extra-record matter in order to resolve what they considered to be one of the key factors in determining the defendant's guilt or innocence: specifically, whether or not Solomon Weiss had criminal knowledge of the fraudulent scheme for which he was indicted. For example, in his testimony at the Voir Dire Hearing, Juror Number 3 testified:

> One of the key aspects of deciding whether or not Mr. Weiss was guilty rested on the argument of whether or not one can reasonably expect him to know certain kinds of things. The understanding that Mr. Kasanof would have had us to accept was that ... [Mr. Weiss] was just following the kinds of things that a bookkeeper or accountant does without really having a good grasp of the significance of it.... And if the man was functioning as a bookkeeper then one might accept that, I suppose. But ... to me what is important, to me the man is trained as a CPA.

(Hr. II 32–33); *see also* June 2, 1982 letter of the same juror quoted on pages 1228–1229, *supra.*

The defendant further argues that the extraneous matter would have been inadmissible if offered as evidence at trial. He claims first, that the textbook excerpts were irrelevant because they "at best relate to a standard of professionalism not applicable to Solomon Weiss", since Weiss was not acting as a CPA at Warner at any material time. Second, defendant argues that the excerpts could not have been admitted to set a standard of care for Weiss because they did not purport to prescribe specific duties and modes of professional conduct, as did the statutes and rules in the cases relied on by the government. Third, the defendant argues that under the Second Circuit's recent decision in *United States v. Maniego,* 710 F.2d 24 (2d Cir.

1983), a practitioner, such as Solomon Weiss, cannot be held to a higher standard of conduct or legal obligation than others because of his professional status. Therefore, the textbook excerpt could not properly have been used to create such a standard of care.

In response, the government makes five main arguments denying that Weiss suffered any serious prejudice as a result of the infiltration of extra-record matter. First, it argues that the textbook excerpt furnished no more than a formal definition of a CPA and that it was cumulative of evidence properly before the jury. Second, the government contends that the nature of a CPA's duties are within the common knowledge of the jurors. Third, the government claims that the formal definition of a CPA was an inconsequential portion of the proof showing Weiss' guilty knowledge. Fourth, the government maintains that the excerpt from the text would clearly have been admissible as evidence if offered at trial. Finally, the government argues that in any event, the Court's instruction to the jury following its receipt of Exhibit "Y", cured any prejudice to defendant resulting from the extra-record matter.

Clearly, the decision that faces this court is a difficult one. Weiss was convicted after a lengthy and complicated investigation and trial. While the jury sincerely tried to perform its duty to the best of its ability in weighing the charges against Weiss, an undisputed error was committed by Juror # 3 in introducing extra-record evidence during the jurors' deliberations. Furthermore, although the textbook definition of a CPA would by itself seem to be a neutral fact, and not inherently inculpatory,[31] the record in this case indicates that at least some of the jurors deemed the definition to be relevant to the issue of Weiss' criminal knowledge. Therefore, we must examine the entire trial record to determine whether there was sufficient independent evidence of Weiss' criminal knowledge to render the infiltration of the extraneous information harmless.

At the outset, we must reject several of the government's arguments. First, the government argues that the extra-record evidence was purely cumulative because there is included in GX 182C, the stock prospectus for the WPT, information concerning an independent audit conducted by the CPAs Touche Ross & Co. On page 18 of the exhibit is the following:

*"Experts"*

The financial statements included in this Prospectus and in the Registration Statement have been examined by Touche Ross & Co., independent public accountants, as indicated in their report appearing elsewhere herein (qualified as set forth therein), and are included in reliance upon the report of such firm and upon their authority as experts in accounting and auditing.

The short answer to this argument is that GX 182C was not introduced for the purpose of explaining to the jury the special expertise or knowledge of a CPA; nor was the existence of this page [buried within the massive government exhibits] known to either the Court, defense counsel or the government attorney at the time of trial. When the note from the jurors regarding the definition of a C.P.A., see Exhibit "Y", was discussed by the Court at trial, both counsel agreed that *there was no evidence in the record as to what a CPA was and with the consent of both counsel, the Court so instructed the jury.* (Tr. 1996) Thus, in view of the trial record, the Court finds no evidence that the jury was aware that GX 182C explained the duties of a CPA.

31. We note that many of the leading cases in this Circuit concerning jury contamination involve extra-record matter which was inherently suggestive of the defendant's guilt. *See United States v. Hillard, supra,* at 1063 (extra-record information *inter alia,* that defendants' "Black Sunday heroin operation ... *was still* in operation." (emphasis added)); *Sher v. Stoughton, supra,* at 793 (several jurors received anonymous phone calls stating that the defendant was guilty); and *United States ex rel. Owen v. McMann, supra* at 815 (extra-record information *inter alia* that the defendant had been in trouble all his life.)

The Court is also not persuaded by the government's argument that the Court issued an instruction which cured the problem now raised in reference to Court Exhibit "Y".[32] The Court disposed of this argument previously, at the May 20, 1983, pre-hearing conference.[33] Although the jurors were instructed in a general way that their decision must be based on evidence in the record, they were not specifically instructed to disregard the textbook excerpt, or any arguments of Juror #3 based on that excerpt. Nor could they have been, since evidence of the jury contamination, and the jury's use of the textbook excerpt in particular, did not surface until over six months after the trial was concluded.

The contention of the government that the nature and functions of a CPA were within the common knowledge of the jurors ignores the plain language of the jury's note to the Court. In that note the jurors were explicit: "Most of us are unfamiliar with the nature or the training of a CPA." See Court Exh. "Y" quoted on page 1227 *supra*. In addition, nothing to the contrary was revealed at the Court's post trial voir dire. Even if, as the government argues, one or more of the jurors knew what a CPA was from "their general knowledge," (Hr. II 38), their sharing of this information with the other jurors would not have been the equivalent of the introduction of an *authoritative* textbook definition. Accordingly, the Court cannot agree

that the extraneous material added nothing to the juror's common knowledge.

The government further argues that no useful purpose would be served by a new trial since the definition of a CPA would then clearly be admissible. The Court agrees that evidence as to the training and duties of a CPA may be admissible as background information if properly introduced at trial.[34] However, we do not agree that the admissibility of the evidence is determinative on the issue of prejudice. The Court's decision not to instruct the jury on the definition of a CPA was not based on the admissibility or inadmissibility of the definition, but on the fact that the evidence was not properly introduced at trial, and thus not subject to rebuttal by the defense.[35] The Court concluded that instructing the jury as to information outside of the trial record would raise serious confrontation problems. The same problems are obviously raised by the jury's own acquisition of the extra-record material. Thus the question of prejudice clearly goes beyond the question of admissibility.

Despite our rejection of several of the government's arguments, we ultimately must agree with the government that the independent evidence of Weiss' criminal knowledge was so "abundant" as to render the infiltration of the textbook definition harmless. An exhaustive review of the record makes it apparent that in addition to the direct testimony of Emmett and Hor-

---

**32.** In response to the note, the Court stated to the jurors:

As far as the inquiry that is above the line, the jurors must decide the case based upon the evidence or lack of evidence in this case. You cannot indulge in guess work, speculation or surmise. There is no statement in the record as to what a CPA is, and that is what the evidence is, a lack of evidence of an explanation of what a CPA is.

As far as what is under the line on the paper [i.e., "Re underlined (Xerox), sentences, Meigs and Meigs"], I don't understand what it means. So I will return the note to the jury, and if you will write a further note, if you desire, in explanation of what it means, "underline Xerox sentences," *et cetera.* We cannot figure out what that means.

(Tr. 1998–1999.)

**33.** Transcript of proceedings, May 20, 1983, at 10–11.

**34.** The Court need not decide whether the definition of a CPA could have been introduced for the purpose of creating a professional standard of care applicable to Solomon Weiss. However, we note that had the government properly introduced the evidence at trial, the Court could have ruled on the purposes for which it could be considered, and instructed the jury accordingly. In this trial, the Court was unable to place any limitations on the jury's use of the definition.

**35.** For example if the definition of a CPA had been introduced during the cross-examination of Solomon Weiss, the defense, on rebuttal, could have emphasized the facts that Weiss was not a CPA for Warner, and was not involved in the auditing of Warner's books.

witz there was substantial circumstantial proof of Weiss' guilt; proof that was not contaminated by the extra-record matter defining the functions of a CPA. This circumstantial evidence included: evidence that Weiss forged the signature of Jay Emmett on an invoice to Warner; evidence that Weiss gave inconsistent testimony before the grand jury and at trial about matters relevant to his guilt; evidence that Weiss was involved in the stock purchases through the writing of memos (including the memo to Mr. Hardy informing him that Warner needed $150,000 shortly for a cable option with the WPT) and the signing of most of the documents in question; evidence that not once prior to and not once since the occasion in question did Weiss' name ever appear on any documents for Warner's stock purchases; evidence that Weiss changed his course of conduct in preparing invoices for consulting services after being questioned by Albert Sarnoff; and evidence from Weiss' secretary that Weiss and Horwitz met and talked on the telephone several times during the period of the stock purchases.

In addition to the circumstantial evidence against Weiss, evidence of his professional background independent of his status as a CPA, was properly before the jury. The fact that Weiss was a CPA was only one aspect of his accounting and financial background developed at trial. He was not a mere bookkeeper who simply recorded numbers. The evidence presented indicated that Weiss was a sophisticated business man who had earned a masters of business administration degree from Rutgers University, had over ten years' experience working in a public accounting firm prior to being hired at Warner, where he was an Assistant Treasurer, and at one point had been a Vice President, and who had significant responsibilities in financial planning for Warner's chief executives.

In light of the other evidence in the record as to Weiss' professional background and corporate responsibilities, and the strong circumstantial evidence supporting the testimony of Emmett and Horwitz, we find that the possibility of prejudice arising from the infiltration of the extra-

record matter is slight. There is ample evidence, exclusive of the extra-record information, to sustain the verdict. Therefore, although we reiterate that we believe this to be a very close question, we conclude that defendant's Rule 33 motion must be denied.

## IV. DEFENDANT'S EARLIER RULE 29 AND RULE 33 MOTIONS

As stated earlier in this opinion, the defendant has also moved for judgment of acquittal, pursuant to Rule 29, or alternatively, for a new trial, pursuant to Rule 33. He makes several arguments in support of these motions. First, Weiss argues that because of the inherent incredibility of the government's principal witnesses, the credible evidence is insufficient to support a verdict of guilty on any account. Next, Weiss contends that the government failed to establish that he devised a scheme to defraud in violation of the RICO or mail fraud statutes. Related to this, is Weiss' claim that the government's proof at trial on the RICO and mail fraud charges varied so greatly from the allegations in the indictment that the indictment was constructively amended in violation of Weiss' Fifth Amendment right to indictment by a grand jury. Finally, Weiss argues that his Fifth Amendment right to indictment by a grand jury was violated by the prosecutor's conduct in presenting the case to the grand jury and that the indictment should be dismissed. For the reasons stated below, the Court finds that Weiss' Rule 29 and 33 motions must be denied.

### I. The Credibility of Emmett and Horwitz

As our earlier examination of the record makes clear, the government's case rested in significant part on the testimony of Emmett and Horwitz. Weiss argues that this testimony is not sufficiently credible to sustain the verdict.

The defendant relies upon testimony of Horwitz to the effect that he "unvaringly received the Warner checks from Weiss, who insisted upon receiving cash before

giving Horwitz a check."[36] The uncontroverted testimony of the defendant, supported by his exhibits[37] was that the defendant was not in New York on the date one of the alleged transfers took place, but, in fact, was in California.[38]

Based on this discrepancy, the defendant argues that no rational juror could have believed the testimony of Horwitz concerning the September 8th transaction. Therefore the jury was compelled to find that the testimony of Horwitz was so inherently illogical and incredible as to raise a reasonable doubt as to the defendant's guilt. The government responds that if the jury found Horwitz was mistaken as to the September 8th transaction, it could reasonably have decided the witness had a faulty recollection only as to that event and could reasonably have given credence to the balance of Horwitz' testimony.

Defendant further argues that Emmett's testimony was inherently incredible because of the strong motive which Emmett had to give false testimony against the defendant. Defendant points out that in exchange for Emmett's testimony as a co-operating witness, the government dismissed a RICO charge against him which would have jeopardized, upon conviction, Emmett's seven million dollar stock holdings in Warner.[39] At the trial, Emmett was cross-examined in great detail as to his stock holdings and his possible motivations in giving testimony. The cross-examination placed his credibility squarely in issue.

■ The Court cannot agree that defendant's challenges to the credibility of Em-

mett and Horwitz provide a sufficient basis to set aside the verdict.

In *United States v. Singh,* 628 F.2d 758, 766 (2d Cir.) *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980), the Court of Appeals held that all issues of credibility are within the exclusive province of the jury. Since the jury in this case resolved the contested credibility issues as to the testimony of Horwitz and Emmett in favor of the government, this Court may not and should not disturb its verdicts. Nor does this Court find, on the record of the trial, that the jury was compelled to reach a different verdict. As stated in our discussion of the jury contamination issue, there was substantial circumstantial evidence on the record supporting Horwitz' and Emmett's testimony.

## II. *The Fraud and Racketeering Counts*

[6] Defendant contends that taking the evidence in the light most favorable to the government, the evidence offered in support of the mail fraud counts (which were also the predicate acts charged under the RICO count) does not, under any theory, establish that Weiss defrauded Warner. More specifically, defendant argues that the creation of a cash fund (which was the theory presented by the government to the jury) does not constitute a fraud. In order to establish mail fraud by an employee against his employer, the government must prove: (1) that the employee breached a duty owed to his employer and (2) that the violation of fiduciary duty was accompanied by failure to disclose material informa-

**36.** Defendant's Memorandum in Support of Motion, hereafter (DM) p. 3.

**37.** Airline tickets, car rental bill, diary and expense vouchers.

**38.** Weiss testified he was in California from September 6 through 9, 1976. The evidence showed that the $10,000 cash Horwitz claimed he gave Weiss, in New York, on September 8, 1976, included $9,500 withdrawn from a bank account on September 8th and $500 cash. Horwitz claimed he received a Warner check from Weiss for $15,344.20 in return for the $10,000 cash. The bank account shows, in addition to the withdrawals of $9,500 on September 8th, the

deposit of the $15,344.20 Warner check on the same day—September 8th.

**39.** The defendant argues that the inclusion of the RICO count in the Emmett indictment was solely or primarily to create a bargaining tool in later plea negotiations and thereby violated the Department of Justice Guidelines. Whatever factual validity that claim may have, the Second Circuit Court of Appeals has held that non-compliance with internal departmental guidelines is not grounds for reversal. *United States v. Myers,* 692 F.2d 823 (2d Cir.1982) *cert. denied,* —— U.S. ——, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983).

tion to the employer while under a duty to do so. *United States v. Barta*, 635 F.2d 999, 1001 (2d Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981). According to the defendant, the evidence in this case established neither a breach of Weiss' fiduciary duty to Warner nor a violation of a duty to disclose material facts. In addition there was no evidence that Weiss acted for personal gain or to harm · Warner. In fact, the evidence showed no more than participation by Weiss in the creation of deceptive documents, and the establishment of a Warner cash fund at the instructions of superiors. Therefore, the evidence does not support the jury's verdict that Weiss, in creating a cash fund, committed a fraud.

The government responds that the evidence clearly demonstrated that Weiss was a pivotal participant in a fraud perpetrated against Warner shareholders. This fraud, which was perpetrated between 1973, and 1977, consisted of the creation of a cash fund through bribery and the theft of Warner's assets. At no time did Weiss ever disclose the existence of this cash fund or this theft of Warner's assets to Warner's stockholders or to anyone. Such a disclosure by Weiss was mandatory in light of the fact that as an executive officer of Warner, Weiss owed a fiduciary duty to its stockholders to provide honest services and to perform his job in their best interests. *Id.*, at 1006.[40]

■ In deciding whether the verdict of the jury should be sustained, this Court must determine whether there is substantial evidence, taking the view most favorable to the government, to support the verdict. *Glasser v. United States*, 315 U.S.

60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Under this standard of review, and on the basis of the entire record, we find that there is substantial evidence that Weiss, an executive officer of Warner, defrauded Warner's shareholders by extracting and accepting $170,000 in cash bribes in return for arranging for Warner to purchase $250,000 worth of stock in the WPT and for converting $221,950 in Warner assets through bogus checks.

■ The defendant's argument is based on too narrow a view of the government's case. The indictment did not charge, nor was the evidence confined solely to the question of creation of a cash fund. Both the indictment and the evidence encompassed a scheme for the creation of a cash fund by the acceptance of kickbacks, conversion of corporate assets and the creation of false documentation to conceal the wrongful acts. Given the Second Circuit's opinion in *United States v. Barta, supra*, at 1007, there can be no serious dispute that the creation of false and fraudulent corporate documents by a corporate officer to conceal payments from the corporate treasury of monies expended for non-existent services, is a fraud on the corporation. Weiss contends that in the case at bar, unlike the situation in *Barta*, no clear conflict between the employee's duty to his employer and his own activities existed since Weiss acted, according to the government's evidence, on the instructions of Warner's highest officers. While it may or may not be true that Weiss' actions had his superiors' approval, the contention that the fraudulent activity was directed by higher officers of the corporation does not make the harm any less injurious to the corporate body. *See Goldberg v. Meridor*, 567 F.2d 209, 217 (2d Cir.1977).[41]

**40.** In reply the defendant contends that the government raised its fiduciary duty to disclose argument for the first time in its Memorandum of Law. He claims that since this theory was not presented to the jury, it cannot be used to support the verdict. The Court cannot agree. During the charge conference, defense counsel suggested, and the government agreed, that since Weiss was a corporate officer, he as a matter of law owed a fiduciary duty to the corporation and its shareholders. Both sides requested that the court should not charge fiduciary duty as a fact to be found by the jury.

Counsel further agreed that if the defendant were found guilty of the RICO counts, the mail fraud or tax counts, such finding, as a matter of law, would constitute a breach of fiduciary duty. The Court further notes that the proof was uncontroverted that the subject matter of Counts 2–4 was sent through the mails.

**41.** In *Meridor*, the Second Circuit affirmed in a civil context, the proposition that there is deception of the corporation (in effect, of its minority shareholders) when the corporation is influenced by its controlling shareholders to engage in a transaction adverse to the corporation's

Defendant's argument that Weiss' participation in the generation of a cash fund on behalf of Warner was not designed to inflict actual economic harm on Warner's shareholders must also be rejected. This argument simply ignores the fact that Weiss, in generating the cash fund caused economic injury in buying $250,000 of speculative WPT stock and in paying out $221,950 of corporate assets for non-existent services,[42] in return for only $170,000 in cash. In addition, the fact that the proceeds from this scheme did not go into Weiss' pockets but instead formed a secret cash fund, does not make the scheme any less fraudulent. *See United States v. Margiotta,* 688 F.2d 108, 118 (2d Cir.1982) *cert. denied,* — U.S. —, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) (the fraud there generated a "slush fund"). There is no requirement under the mail fraud statute that the perpetrator must enrich himself. As this Circuit explained in *Margiotta:*

> In the private sector, it is now a commonplace that a breach of fiduciary duty in violation of the mail fraud statute may be based on artifices which do not deprive any person of money or other forms of tangible property. See *United States v. Barta, supra,* 635 F.2d at 1005–06 (deprivation of employer's right to employee's honest and faithful services) .... Fraudulent schemes designed to cause losses of an intangible nature clearly come within the terms of the statute.

*Id.* at 121.

A close reading of the statute supports this result. Section 1341 prohibits "any scheme or artifice to defraud, *or* for obtaining money or property by means of false or fraudulent pretenses, representations or promises." (emphasis added). Accordingly, the prohibition against schemes or artifices to defraud is properly interpreted as independent of the clause "for obtaining money or property" (cite omitted).

### III. *The Constructive Amendment of the Indictment*

Finally, defendant argues that the indictment in this case with respect to counts one through five, was constructively amended. Specifically, Weiss argues that the indictment demonstrates that the grand jury believed the case involved bribery of Weiss and theft by him and others of corporate monies. This theory, Weiss argues, was displaced with a "cash fund" theory at trial.

The Court does not find a "shift of theory" or a constructive amendment of the indictment by the proof submitted to the jury. The indictment in this case charged, *inter alia,* that Weiss and others having devised and intending to devise a scheme and artifice to defraud Warner and its shareholders and for obtaining money from Warner and its shareholders by means of false and fraudulent pretenses, representations and promises, unlawfully, wilfully and knowingly, and for the purpose of executing said scheme and artifice and attempting so to do, did cause to be placed in post offices and authorized depositories for mail matter, and did cause to be delivered by mail according to the direction thereon, certain matter to be sent and delivered by the Postal Service, in violation of Title 18, United States Code, Section 1341, as set forth below:

The jury was given copies of the indictment and they were charged in part:

> You must first determine whether the credible evidence established the existence of the fraudulent scheme charged in the indictment
>
> ....
>
> The government contends that the fraudulent scheme was the creation of the cash fund at Warner. ...
>
> The government must establish beyond a reasonable doubt that the defendant wilfully and knowingly participated in the fraudulent scheme with knowledge of its

interests (in effect, the minority shareholders' interests) and there is nondisclosure or misleading disclosures as to the material facts of the transaction.

**42.** Even assuming the $170,000 "kickback" was placed in a cash fund for the benefit of the corporation, it is significantly less than the $221,950 which was paid out.

unlawful purposes and in furtherance of its unlawful objectives.

At trial, the government presented the theory that through bribery (the initial cash payment by Horwitz to Weiss) and theft by Weiss and others of corporate monies, a secret cash fund was established. The jury charge specifically mentions the creation of a cash fund. However, neither at trial nor during the jury charge conference did Weiss ever object to the evidence or instructions concerning the cash fund. Furthermore, there is no variance between the proof and pleadings in this case. *See Dunn v. United States*, 442 U.S. 100, 105, 99 S.Ct. 2190, 2193, 60 L.Ed.2d 743 (1979). The cash fund proof offered at trial was not an alternative theory, but simply traced the proceeds of the illegal scheme.

In sum, the Court finds that the government contended, and the jury found, that Weiss received the $70,000 in the May transaction and the $100,000 in the July transaction in his capacity as a corporate officer who was under a duty not to provide false documentation to conceal the nature of the transactions in the corporate records. This Court is of the opinion that the receipt by Weiss of these monies, whether denominated corporate bribes or kickbacks; and their deliberate concealment, operated as a fraudulent scheme upon the corporation and its shareholders. Accordingly, defendant's motion with respect to the fraud and RICO counts must be denied.

## IV. *The Grand Jury Presentation*

Weiss also moves to dismiss the indictment on the grounds that the prosecution improperly told the grand jury information about the case that the grand jury did not possess and improperly elicited Emmett's and Horwitz' testimony before the grand jury through leading questions.

The government defends its actions by stating that the prosecutor did not inform the grand jury of information that was unavailable to them. The government also denies that there was anything improper about the fact that the government elicited Emmett's and Horwitz' testimony through leading questions.

This Court has previously expressed its views about a grand jury presentation in which all of the evidence heard by the grand jurors was through leading questions posed by the Assistant United States Attorney. Such excessive control of witnesses deprives the grand jurors of their ability to assess the credibility of the witness and the reliability of the story told. However, this appears to be the practice in this District and although the Second Circuit has commented on the government's presentations in other contexts, it has not in its supervisory capacity, condemned this practice. (*See, e.g., United States v. Jacobson*, 691 F.2d 110, 115–16 (2d Cir.1982); *United States v. Ciambrone*, 601 F.2d 616, 623 (2d Cir.1979); *United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir.1972); *United States v. Provenzano*, 440 F.Supp. 561, 565–66 (S.D.N.Y.1977); *United States v. Pastor*, 419 F.Supp. 1318, 1323–24 (S.D.N.Y.1975); *United States v. Gallo*, 394 F.Supp. 310, 315–16 (D.Conn.1975). This Court is of the opinion that this argument should be addressed to the Second Circuit.

The Court need not here repeat the reasons for its ruling, during trial, that the issue of materiality would not be presented to the jury as part of the perjury charge. The trial record is clear.

Finally, defendant states that the question of forfeiture under the RICO statute, should be addressed when and if it becomes ripe in connection with sentencing. In accord with this thinking, the Court will address the issue of the RICO forfeiture prior to sentencing.

For the above stated reasons, this Court also denies defendant's Rule 29 and 33 motions.

It Is So Ordered.